JUSTIN T. BERGER (SBN 250346)
jberger@cpmlegal.com
SARVENAZ (NAZY) FAHIMI (SBN 226148)
sfahimi@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Relator*

## IN THE UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA AND THE STATE OF CALIFORNIA** *ex rel.* **THOMAS TURNER,** | CASE NO. 17-cv-01757 LJO SAB |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND CALIFORNIA FALSE CLAIMS ACT** |
| v. | |
| **DYNAMIC MEDICAL SYSTEMS LLC; JOERNS HEALTHCARE LLC; COVENANT CARE CALIFORNIA LLC; MARINER HEALTH CARE MANAGEMENT COMPANY; PLUM HEALTHCARE GROUP LLC; and CAMBRIDGE HEALTHCARE SERVICES.** | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE .........................................................................2

III.    PARTIES ............................................................................................................2

IV.     OVERVIEW OF THE SCHEME ......................................................................3

        A.      Medi-Cal, Medicaid, and the Federal Anti-Kickback Law ...........3

        B.      How SNF Reimbursement Operates..................................................4

        C.      How Defendants' Fraudulent Scheme Operated ............................7

        D.      Defendants' Discriminatory Billing Practices Violate Federal and California Law ...............................................................................16

        E.      Defendants' "Qualifying Wound" Scheme Violated Medi-Cal's Low Price Rules. ................................................................................17

        F.      Defendants' Kickbacks Induced the Referral of Medicare Business ..........17

        G.      Further Evidence of the Scheme.....................................................17

V.      CAUSES OF ACTION.....................................................................................19

        FIRST CAUSE OF ACTION
        Violations of the Federal False Claims Act Presenting False Claims
        (31 U.S.C. § 3729(a)(1)(A))
        On Behalf of the United States Against All Defendants .............................19

        SECOND CAUSE OF ACTION
        Violations of the Federal False Claims Act Making or Using False Records or
        Statements Material to Payment or Approval of False Claims
        (31 U.S.C. § 3729(a)(1)(B))
        On Behalf of the United States Against All Defendants .............................20

        THIRD CAUSE OF ACTION
        Violations of the Federal False Claims Act Conspiracy to Commit Violations of the
        False Claims Act (31 U.S.C. § 3729(a)(1)(C))
        On Behalf of the United States Against All Defendants .............................21

        FOURTH CAUSE OF ACTION
        Violations of the California False Claims Act Presenting False Claims
        (Cal. Gov. Code § 12651, subd. (a)(1))
        On Behalf of the State of California Against All Defendants .....................22

        FIFTH CAUSE OF ACTION
        Violations of the California False Claims Act Making or Using False Records or
        Statements to Obtain Payment or Approval of False Claims
        (Cal. Gov. Code § 12651, subd. (a)(2))
        On Behalf of the State of California Against All Defendants .....................22

SIXTH CAUSE OF ACTION
(In the Alternative)
Violations of the California False Claims Act Inadvertent Submission of False Claims
(Cal. Gov. Code § 12651, subd. (a)(8))
On Behalf of the State of California Against All Defendants ...................................... 23

SEVENTH CAUSE OF ACTION
Violations of the California False Claims Act Conspiracy
(Cal. Gov. Code § 12651, subd. (a)(3))
On Behalf of the State of California Against All Defendants ...................................... 24

VI.   PRAYER FOR RELIEF .......................................................................................... 24

VII.   JURY DEMAND .................................................................................................... 26

Plaintiffs the United States of America ("United States") and the State of California, by and through Relator Thomas Turner ("Relator"), allege as follows.

# I.   INTRODUCTION

1.   Relator brings this action on behalf of the United States and the State of California to recover losses sustained by the Medicare and Medi-Cal programs, as a result of Defendants' differential billing practices, as well as kickbacks paid by Dynamic Medical Systems LLC ("Dynamic") and Joerns Healthcare LLC. ("Joerns") to various Skilled Nursing Facilities ("SNFs"), including the other Defendants in this action.

2.   This is a classic "swapping" scheme in which Dynamic and Joerns' kickbacks took the form of deep discounts to certain patient populations on the daily rental rates for certain specialty beds and mattresses.  Dynamic used these discounts to induce SNFs to refer to them higher paying business.  These discounts padded the profits of various SNFs, including Covenant Care California, LLC, Plum Healthcare Group LLC, Cambridge Healthcare Services, and Mariner Healthcare.

3.   At the same time, Dynamic and Joerns overcharged other patients who were responsible for a Share of Cost (SOC) of their SNF care.  These overcharges were ultimately borne by the patients, as well as the Medicare and Medi-Cal programs.

4.   Defendants' practices violated the Anti-Kickback statute (42 U.S.C. § 1320a-7b), California Code, Welfare and Institutions Code (WIC) § 14107.2, and Medi-Cal's low price rules, and resulted in violations of both the Federal False Claims Act and the California False Claims Act.

5.   In accordance with the Court's Order (ECF No. 135), this Amended Complaint adds details regarding the "how," "when," and "who" of Defendants' schemes.  In particular, this Amended Complaint details *how* claims are submitted by the SNFs, Dynamic, and Joerns to Medicare, Medi-Cal, and other payors, and *how* Defendants engaged in the kickback scheme.  This Amended Complaint provides additional detail as to *when* the kickbacks were provided and *when* false certifications and claims were submitted, which was every month during the course of the business relationship between the SNFs and Dynamic and Joerns; i.e., this was an ongoing scheme that tainted every single one of their claims to Medicare and Medi-Cal, not a one-time occurrence.

---

**FIRST AMENDED COMPLAINT; CASE NO. 17-cv-01757 LJO SAB**                          1

And this Amended Complaint identifies by name *who* spearheaded the schemes on behalf of each Defendant.

## II.   JURISDICTION AND VENUE

6.     This Court has jurisdiction over the False Claims Act ("FCA") causes of action raised in this complaint under 28 U.S.C. § 1331, as they arise under Federal law.  This Court also has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732, which confers jurisdiction for claims brought under the FCA on the District Courts of the United States.

7.     Additionally, this Court has supplemental jurisdiction over the other claims in this action pursuant to 31 U.S. Code § 3732(b), as they arise from the same transaction or occurrence as the federal claims.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as they are so related to the FCA claims in the action that they form part of the same case or controversy.

8.     Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendants transact business in this district.

## III.   PARTIES

9.     Plaintiff in this action the United States of America and the State of California, by and through Relator Thomas Turner.

10.     Relator Thomas Turner is a resident of Huntington Beach, California.  He was hired by Dynamic in February 2006, after Dynamic acquired Relator's company.  Relator served as Dynamic's President of Long Term Care, and Director for Joerns from 2016 through 2018.

11.     Dynamic Medical Systems LLC ("Dynamic") is a Nevada limited liability corporation headquartered in Rancho Dominguez, California.  Dynamic is in the business of leasing specialty mattresses and bed frames to SNFs.  Among other things, these mattresses prevent and treat wounds and ulcers, reduce soft tissue distortion, and promote blood flow.  Dynamic's specialty mattress products include:  Airdyne, Dynamax, MA 65, and MA 85.  Dynamic became a subsidiary of Invacare around October 2011.

12.     Joerns Healthcare LLC ("Joerns") is a Delaware corporation headquartered in Stevens Point, Wisconsin.  Like Dynamic, Joerns is in the business of leasing mattresses to SNFs.  Joerns

1  specialty mattress products include:  DermaFloat, ProMatt, Dynamax.  Joerns acquired Dynamic

2  from Invacare in or around July 2015.

3       13.  Invacare Corporation is an Ohio Corporation based in Elyria, Ohio.  Invacare acquired

4  Dynamic in 2011, and later sold the company, along with the rest of its medical device rentals

5  businesses for long-term care facilities to Joerns in or around July 2015.

6       14.  Covenant Care California, LLC ("Covenant"), is a California limited liability

7  corporation headquartered in Aliso Viejo, California.  Covenant manages about 30 SNFs in

8  California and entered into discriminatory billing agreements with Joerns.

9       15.  Mariner Health Care Management Company ("Mariner") is a Delaware corporation.

10 Mariner operates around 19 SNFs in Northern and Southern California and entered into

11 discriminatory billing agreements with Joerns.

12      16.  Plum Healthcare Group LLC ("Plum") is a California limited liability company based

13 in San Marcos, California which manages around 64 SNFs.  Plum entered into discriminatory billing

14 agreements with Dynamic.

15      17.  Cambridge Healthcare Services ("Cambridge") is a California limited liability

16 company based in Los Angeles, California.  Cambridge manages around 37 SNFs and entered into

17 discriminatory billing agreements with Dynamic.

18 **IV.  OVERVIEW OF THE SCHEME**

19      **A.  Medi-Cal, Medicaid, and the Federal Anti-Kickback Law**

20      18.  Medicaid is a joint Federal-State program which provides, among other things, long-

21 term care for seniors.  Medicaid provides a means for nursing facility residents to pay for skilled-

22 nursing care, as well as room and board in a nursing facility certified by the federal government to

23 provide services to Medicaid beneficiaries.

24      19.  Medi-Cal is California's Medicaid program.  This is a public health insurance program

25 which provides needed healthcare services for low-income individuals including families with

26 children, seniors, persons with disabilities, individuals in foster care, pregnant women, and low-

27 income people with specific diseases such as tuberculosis, breast cancer or HIV/AIDS.  Medi-Cal is

28 financed equally by the State of California and the federal government.

20.     Medicare also provides reimbursements to SNFs depending on several factors, including the character of the facility, the beneficiary's circumstances, and the types of items and services provided.  SNFs are typically reimbursed under Medicare Part A for the costs of most items and services, including room, board, ancillary items, and services.  In some circumstances, SNFs may receive payments under Medicare Part B.

21.     The Federal Anti-Kickback Law, codified at 42 U.S.C. § 1320a-7b, has been on the books since 1972.  Its main purpose is to protect patients and federal healthcare programs, including Medicaid and Medicare, from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions.  The law establishes civil and criminal penalties for persons who knowingly and willfully receive or pay anything of value to influence the referral of federal health care program business, including Medicare and Medicaid.

22.     California Code, Welfare and Institutions Code (WIC) § 14107.2 also addresses kickbacks and protects patients and California healthcare programs from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions.

23.     To comply with the Anti-Kickback Laws, SNFs must ensure that all discounts they receive are properly disclosed and accurately reflected on their cost reports.  SNFs must also be careful that there is no link or connection between discounts offered or solicited for business that the nursing facility pays for and the nursing facility's referral of business billable by the supplier or provider directly under any state or federal health care program.  For example, nursing facilities may not engage in swapping arrangements by accepting a low price from a supplier or provider on an item or service covered by the SNF's per diem payment in exchange for the SNF referring to the supplier other state or federal health care program business.  Such swapping arrangements implicate the anti-kickback statute and are not protected by the discount safe harbor.

**B.     How SNF Reimbursement Operates**

24.     A Skilled Nursing Facility ("SNF") is a health-care institution that meets federal criteria for Medicaid and Medicare reimbursement for nursing care including especially the supervision of the care of every patient by a physician, the employment full-time of at least one registered nurse, the maintenance of records concerning the care and condition of every patient, the

availability of nursing care 24 hours a day, the presence of facilities for storing and dispensing drugs, the implementation of a utilization review plan, and overall financial planning including an annual operating budget and a 3-year capital expenditures program.

25.     In the Balanced Budget Act of 1997, Congress mandated that payment for the majority of services provided to beneficiaries in a Medicare covered SNF stay be included in a bundled prospective payment made through the Part A Medicare Administrative Contractor (MAC) to the SNF.  These bundled services had to be billed by the SNF to the Part A MAC in a consolidated bill. No longer would entities that provided these services to beneficiaries in a SNF stay be able to bill separately for those services.  Medicare beneficiaries can either be in a Part A covered SNF stay which includes medical services as well as room and board, or they can be in a Part B non-covered SNF stay in which the Part A benefits are exhausted, but certain medical services are still covered though room and board is not.  The consolidated billing requirement confers on the SNF the billing responsibility for the entire package of care that residents receive during a covered Part A SNF stay and physical, occupational, and speech therapy services received during a non-covered stay.

26.     Medicare thus pays SNFs under a prospective payment system ("PPS") for beneficiaries covered by the Part A extended care benefit.  Covered beneficiaries are those who require skilled-nursing or rehabilitation services and received the services from a Medicare certified SNF after a qualifying hospital stay of at least three days.  The PPS rate is a fixed, per diem rate.  The maximum benefit is 100 days per "spell of illness."

27.     The PPS pays for all SNF Part A inpatient services.  Until recently, Part A payment was primarily based on the Resource Utilization Group (RUG) assigned to the beneficiary following required Minimum Data Set (MDS) 3.0 assessments.  As a part of the Resident Assessment Instrument (RAI), the MDS 3.0 is a data collection tool that classifies beneficiaries into groups based on the average resources needed to care for someone with similar needs.

28.     In July 2018, CMS finalized a new case-mix classification model, the Patient Driven Payment Model (PDPM), that, effective beginning October 1, 2019, is used under the SNF PPS for classifying SNF patients in a covered Part A stay.  PDPM helps determine payment by classifying SNF patients in covered Part A stays.  PDPM replaces the RUG payment system and improves

1   payments under the PPS by: improving payment accuracy by focusing on patient characteristics,

2   rather than amount of services provided, reducing administrative provider burdens, and improving

3   SNF payments to currently underserved patients without increasing total Medicare payments.

4          29.     SNFs bill Medicare Part A using Form CMS-1450 (also called the UB-04) or its

5   electronic equivalent.  SNFs use a consolidated bill when filing claims with a Medicare

6   Administrative Contractor ("MAC") including most services from entities other than the SNF.

7   Entities delivering patient services in a Medicare-covered Part A SNF stay (such as Dynamic and

8   Joerns) must bill the SNF for their services, not the MAC directly.  Typically, the SNFs send claims

9   sequentially, monthly, and upon a decrease to less than skilled care, discharge, or benefit period

10  exhaustion.  SNFs must bill sequentially, month by month, because the MACs return a continuing

11  SNF stay bill if the prior bill has not processed.

12         30.     Medi-Cal reimburses SNFs for the costs associated with caring for eligible patients.

13  For some of these eligible patients, Medi-Cal reimburses SNFs for the full cost of the patients' care at

14  a capitated rate.  The CMS-1500 and UB-04 (also referred to as CMS-1450) claim forms were

15  adopted by Medi-Cal in 2007 to comply with Federal and State regulations promoting uniformity in

16  billing.  The UB-04 bill is used to bill Medi-Cal for capitated rate patients.  The CMS-1500 form is

17  used to bill Medi-Cal for certain other patients who qualify not for capitated reimbursement, but

18  reimbursement from Medi-Cal on a fee-for-service basis.

19         31.     Other Medi-Cal recipients must pay, or agree to pay, a monthly dollar amount toward

20  their medical expenses before they qualify for Medi-Cal benefits.  This dollar amount is called Share

21  of Cost ("SOC").  A Medi-Cal subscriber's SOC is similar to a private insurance plan's out-of-pocket

22  deductible.

23         32.     Generally, a beneficiary's SOC is determined by the county welfare department and is

24  based on the amount of income a subscriber receives in excess of "maintenance need" levels.  Medi-

25  Cal rules require that subscribers pay income in excess of their "maintenance need" level toward their

26  own medical bills before Medi-Cal begins to pay.  Both earned income and unearned income —

27  including from sources such as Social Security retirement, survivors or disability benefits, pensions,

28

and interest from bank accounts, and State Disability Insurance — can count towards income for the purposes of calculating SOC.

33.     Providers, including SNFs, access the Medi-Cal eligibility verification system to determine if a subscriber must pay an SOC.  The message returned by the eligibility verification system includes the SOC dollar amount the subscriber must pay.  Those SOC funds are paid by patients into trust fund accounts at the SNF.  The SNFs are responsible for maintaining and managing those trust fund accounts, and must keep track of expenditures from those SOC accounts on an official form (DHS 6114).

34.     Under *Johnson v. Rank*, No. C-84-5979-SC, 1984 WL 48801 (N.D. Cal. Dec. 7, 1984), Medi-Cal recipients can elect to use their SOC funds to pay for necessary, non-covered, medical or remedial-care services, supplies, equipment and drugs that are prescribed by a physician and part of the "plan of care" authorized by the recipient's attending physician.

35.     A medical service is considered a non-covered benefit if either: (1) the medical services is rendered by a non-Medi-Cal provider, or (2) the medical service falls into the category of services for which a Treatment Authorization Request ("TAR") must be submitted and approved.

36.     In the event a Medi-Cal recipient spends part of his or her SOC on "non-covered" medical or remedial services, the SNF must subtract those amounts from the recipient's SOC and bill the recipient in an amount equal to the remaining SOC.  The SNF then bills Medi-Cal in an amount equal to the difference between the typical Medi-Cal funding per patient and this particular patient's remaining SOC.

37.     For example, a patient who pays $600 per month on non-covered medical expenses and has a $1000 SOC will only need to pay $400 out of her SOC for covered services before qualifying for Medi-Cal benefits.  The facility would then deduct $400 from the amount billed to Medi-Cal.  Medi-Cal thus pays $400 less per month than it pays for a typical Medi-Cal patient without an SOC.

**C.     How Defendants' Fraudulent Scheme Operated**

38.     Defendants engaged in a swapping arrangement to defraud Medicare and Medi-Cal. Under the scheme, Dynamic and Joerns offered deep discounts on specialty mattress rental rates to

certain patient segments in order to induce SNFs to use their products.  At the same time, Dynamic and Joerns overcharged patients who were responsible for an SOC.  The overcharges were borne by the patients and government payers, as opposed to the SNFs.

39.     In return for the discounts offered by Dynamic and Joerns, SNFs would refer 90 to 100 percent of their patients to Dynamic and Joerns.

40.     Dynamic and Joerns charge three different mattress rental rates, as detailed in the following paragraphs.

41.     First, the stated and published rate billed directly to Medi-Cal by Dynamic and Joerns is $18.76 per day.  Dynamic and Joerns only bill Medi-Cal directly for the $18.76 per day rate for a portion of patients with "qualifying wounds" that require specialty mattresses and equipment.  In billing Medi-Cal for the "qualifying wounds" patients, Dynamic and Joerns submit claims using the CMS-1500 form, or electronic equivalent.  The submission explicitly certifies, among other things, that the suppliers (Dynamic or Joerns) have provided truthful and accurate information and have followed the laws relating to Medicare and Medicaid (e.g. in California, Medi-Cal).  These laws include the Anti-Kickback Statute, the FCA and Medi-Cal low price rules.  The back page of the CMS-1500 form includes an explicit certification that providers and suppliers attest to the following:

SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE . . .
. . .

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

42.     As detailed further herein, Dynamic and Joerns violated these laws by participating in a swapping scheme and discriminatory billing.  Accordingly, each time Dynamic and Joerns submitted a claim to Medi-Cal for mattress rental to a "qualifying wound" patient, that claim was false, as Dynamic and Joerns were not in compliance with the explicit certifications that accompanied those claims.  Even absent the certifications, the claims were false, because they were overcharges; i.e., they charged Medi-Cal more than they had agreed to and were entitled to.  Dynamic and Joerns are in possession of detailed billing and reimbursement records that will easily identify each and every claim they submitted to Medi-Cal for "qualifying wound" patients, including the identity of the patient, the date of service, the date the bill was submitted, the amount of the charge, and the amount reimbursed.  Bills were submitted by Dynamic and Joerns by various personnel in their billing departments, however, the certifications are those of the company (rendering provider) itself.  It is common knowledge in the healthcare industry that the Medi-Cal and Medicare claim forms include the foregoing certifications.

43.     Second, as to patients with private insurance, Medicare, and patients with Medi-Cal and no SOC, Dynamic and Joerns charged SNFs a massively discounted price of between $3 and $6 per day. These patients are known in the industry as the "facility" segment.  These fees are not billed directly to Medi-Cal by Dynamic and Joerns.  Instead, the SNFs pay Dynamic and Joerns these amounts out of the set capitated rates that the SNFs receive from the payors.  Accordingly, the deeply discounted prices are a massive benefit to the SNFs' bottom lines, and represent kickbacks from Dynamic and Joerns to the SNFs.  Each claim form submitted to Medicare, Medi-Cal and other government payors by the SNFs for capitated payments that covered, in whole or in part, these deeply discounted mattress rentals from Dynamic or Joerns were false, because those rentals were procured through kickbacks.

44.     Third, patients in the SOC segment are charged a "retail" price of up to $23 per day by Dynamic and Joerns.  These non-discounted "retail" prices are ultimately borne by the patients and the government, not the SNFs.

45.     Consider, for example, a patient, who lives in a SNF that is reimbursed $5,000 per month by Medi-Cal.  If that patient is in the facility segment, and is not responsible for any SOC, Dynamic and Joerns may charge the heavily discounted rate of $3 per day.  Medi-Cal pays a capitated rate of $5,000 per month for the patient's care. Out of that $5,000, the SNF pays Dynamic and Joerns $90 ($3 per day times 30 days) for the specialty mattress rental, and has $4,910 left over for the remainder of the patient's care (and for profits).  Ultimately, the government pays the SNF $5,000 per month for this patient's care.

46.     If the patient has an SOC of $1,000 and is charged the same amount as the facility segment for the specialty mattress, the patient pays $90 out of her SOC for the specialty mattress and, assuming there are no other uncovered costs, the remainder of the SOC ($910) goes to the SNF for the rest of her covered care.  Medi-Cal is then responsible for the remaining $4,090 of the SNF's $5,000 monthly charges.  This is how the program would function without discriminatory billings and kickbacks.

47.     But under Defendants' scheme, SOC patients are charged an inflated rate of up to $23 per day.  Thus, the same patient would pay about $690 of her monthly SOC for the specialty mattress, and have only $310 left over to satisfy her SOC obligation.  Medi-Cal is responsible for the remaining $4,690 of the SNF's $5,000 monthly charges.

48.     In the example above, **Medi-Cal thus pays an additional $600 per patient per month due to Defendants' differential billing**.  Moreover, each SOC patient must pay an additional $600 out of their SOC for a specialty mattress, meaning they have $600 less to spend on other uncovered, but necessary medical costs.

49.     The following chart summarizes this example:

| Patient Type | Patient Funds from SOC | Specialty Mattress Rental Daily Cost | Specialty Mattress Rental Monthly Cost | Monthly SOC payment prior to Medi-Cal Reimbursement | Medi-Cal Funding to SNF Per Month |
|---|---|---|---|---|---|
| Medi-Cal Patient with no SOC | $0 | $3 | $90 | N/A | $5000 |

| (Facility-pay) | | | | | |
|---|---|---|---|---|---|
| Medi-Cal covered Patient with $1000 SOC (Legal way to bill) | $1000 | $3 | $90 | $910 | Approximately $4090 |
| Medi-Cal covered Patient with $1000 SOC (Dynamic billing scheme) | $1000 | $23 | $690 | $310 | Approximately $4690 |

50.     Every month, SNFs participating in the scheme provide Dynamic and Joerns with a list of their patients, and the payors that are responsible for those patients.  This information is conveyed in a form known as the "Share of Cost Acknowledgement letter."  Using this list, Dynamic and Joerns differentiate between patients who are responsible for a SOC and those that are not, and charge those patient populations different prices.

51.     Moreover, within the SOC patient population, Dynamic and Joerns charge different prices in order to max-out their profits from the scheme without raising red flags.  If their rates are too high, they risk exhausting the SOC and leaving a balance that the patient or SNF must pay—something that would raise questions from the patient, and defeat the purpose of the scheme for the SNF.  On the other hand, if they keep the rates within the SOC limit, then Medi-Cal will fully shoulder the burden of the differential pricing, without the patient every becoming aware.  For example, if an SOC patient has an SOC of only $500, Dynamic and Joerns will set the daily rate at approximately $16, so that the monthly rental does not exceed the SOC amount, resulting in charges to the patient that would raise questions.  If the SOC patient has an SOC of $1000, then Dynamic and Joerns will charge their full $23 "retail" rate.

52.     Each month, the SNFs receive invoices from Dynamic and Joerns—a separate invoice for each patient, both SOC and non-SOC facility patients.  The SNFs are thus fully aware of the differential pricing; they know that the facility prices they receive from Dynamic and Joerns are drastically discounted from the SOC pricing.  In other words, the SNFs are fully aware that they are

1    receiving a kickback, and in exchange, they order all of their mattresses from Dynamic and Joerns.  It

2    is a classic *quid pro quo*.

3        53.    In fact, the *quid pro quo* is reflected and memorialized in the contractual agreements

4    between the SNFs and Dynamic and Joerns.  Specifically, the contracts between the SNFs and

5    Dynamic/Joerns <u>require</u> the SNFs to use Dynamic/Joerns <u>exclusively</u> for all bed and mattress needs

6    (and other medical equipment needs as well).  In exchange, Dynamic and Joerns provide guaranteed,

7    heavily discounted price lists, attached to those contracts.

8        54.    As but one example, Dynamic's August 1, 2012 requirements contract with Jeffrey

9    Pine Holdings, LLC dba Villa Las Palmas Healthcare Center, which is owned by Plum, attached

10   hereto as **Exhibit A**, sets forth a price list (attached as Exhibit B to the contract) with a daily rental

11   rate for AirDyne Mattresses of $5 to $6, an approximately 75% discount off of the rates Dynamic

12   charged SOC patients and Medi-Cal.  In exchange for these discounts, Plum agreed to the following

13   clause, which requires Plum to order *all* of its mattress and other medical supplies from

14   Dynamic/Joerns:

15

16   **1.    Requirements Contract; Scope**

17       **A.    Facility** hereby agrees to fill its requirements for Resources from Provider,
         subject to any legal rights of patients of Facility to choose alternative providers;

18       and, in consideration thereof, Provider hereby agrees to fill the requirements of
         Facility for the Resources in an efficient, timely and professional manner, in

19       substantial compliance with all applicable government regulations and at the
         rates specified herein.  The initial prices for the Resources are set forth on

20       Exhibits B & C hereto.

21

22       55.    Attached hereto as **Exhibit B** is an August 1, 2015 provider agreement between

23   Dynamic and Queen Ann's Lace Holdings, LLC dba Whitney Oaks Care Center, owned by Plum.

24   "Exhibit B" to the agreement lists sections for both the "tiered daily rental rate" and "daily rentals."

25   While the "tiered rates" for mattresses range between $2.50 per day and $6.50 per day, the "daily

26   rentals" for 8 mattresses $13 per day or more.  The document includes the same *quid pro quo*—the

27   "requirements" language—as above.

28

56.     Attached hereto as **Exhibit C** is an October 1, 2016 provider agreement between LAC Verdugo Operations LLC dba Glendale Post Acute Center and Dynamic. "Exhibit B" to the agreement lists the pricing for daily mattress rentals. The daily rental rates for alternating pressure mattresses between $6 and $8.  The document includes virtually the same *quid pro quo*—the "requirements" language—as above, however for slightly less with "an aggregate 90% utilization rate".

57.     These are representative examples of the *quid pro quo* reflected in multiple contracts between Dynamic and/or Joerns and the SNF Defendants' facilities.  Until at least 2018, this was a standard contractual provision in the Dynamic and Joerns contract.

58.     The individuals described in the following paragraphs were primarily responsible for entering into these agreements and/or implementing the SOC differential billing scheme.

59.     Dynamic has carried out this scheme since at least 2006, when it acquired Relator's company, when then CEO, Dave Robertson informed Relator that he would be overcharging SOC patients at several SNF facilities.  Robertson was also the controlling shareholder of Dynamic.  Robertson was the person who implemented the SOC program at Dynamic and created higher price billing for SOC patient and qualifying wound patients, which resulted in differential billing.  He spearheaded the discriminatory billing practices.  Dynamic was sold to Invacare in September 2011 with a one year earn out and the total sale exceeded $52,000,000.  It is estimated the billing scheme was a significant factor in the valuation and sale.

60.     Relator continued to work with Invacare for about 18 months as a consultant and Joerns in 2016 to 2018 after Dynamic was acquired.  Spreadsheets and other data show that in 2011 Dynamic/Invacare was clearly continuing to charge different rates for SOC patients, for identical products.  For example, SNF Legacy Post-Acute Rehabilitation Center was sanctioned by the California Department of Health Care Services ("DHCS") after a December 2011 cost report was filed by Legacy relating to charges associated with Dynamic/Invacare.  In April 2013, after auditing the cost report, DHCS found Legacy was overpaid $46,626 because of discriminatory billing practices.  Legacy appealed this ruling which was upheld in 2015 by an Administrative Law Judge.

61.     Numerous Dynamic/Joerns employees carried out the scheme.  Jane Jeys was a Clinical Nurse at Dynamic.  She was instructed to search-out all SOC and Medi-Cal business in order to increase profits.  Ellen Murphy was a Clinical Nurse for Dynamic.  Murphy was told to capture as much SOC and Medi-Cal business as possible.

62.     Dynamic continued the scheme after it was acquired by Invacare in 2011, as well as through Joerns once Joerns acquired Dynamic from Invacare in 2015.  Joerns carried out the scheme from at least 2015 through 2018.  Correspondence internally at Joerns from January of 2019 indicates that it had been carrying out the scheme until that time.  It was also understood that Joerns perpetrated an identical scheme before it acquired Dynamic.

63.     Greg Apostolou was the former CEO and President of Dynamic and oversaw all operations of Dynamic prior to its sale to Invacare.  Apostolou worked under Invacare for approximately one or two years and in or about 2016 returned to the company, after it had been acquired by Joerns in 2015.  He was a top executive at Joerns and directly under the CEO, and had continued involvement with California operations.  At Dynamic, Invacare and Joerns, Apostolou was one of the drivers of differential billing.  He pushed high volume and sales to employees, coupled with inflated billing of mattresses to the SOC population.  In 2016, Apostolou admitted to Relator that unless SNF customers requested that Joerns lower the rates for SOC patients to match the facility patient rates, Joerns would continue to charge a higher rate for the SOC population because Joerns was benefitting from increased revenues through the practice.  Apostolou was involved in the negotiations with Defendant Plum and with Legacy Healthcare, a SNF that had been sanctioned by the DHCS for engaging in discriminatory billing with Dynamic.  Despite the agency investigation of Legacy Healthcare, Apostolou knowingly continued the scheme and pushed for Plum to continue to invoice SOC patients at higher rates.  Plum was later audited as well.

64.     Robert Husband was an Account Executive in Northern California and one of the key players in carrying out the differential pricing scheme by working with the SNFs and Joerns' team members in securing SOC patients, and intentionally charging those patients a higher rate.

65.     Dennis Zierden is the Vice President of Post-Acute Sales at Joerns and was responsible for overseeing California accounts, and had frequent meetings with SNF customers.  He

managed both the Mariner and Covenant accounts from at least 2010 through 2018.  Zierden utilized the fraudulent billing practices to hit sales quotas.

66.     Directors, Clinical Specialists and other Joerns' sales agents were trained to increase SOC rentals.  For example, Odily Franklin, a former Joerns' RN Clinical Solutions Specialist, was responsible for Mariner accounts in Los Angeles and San Fernando Valley from at least 2016 through 2018.  She was tasked with invoicing as many SOC patients as possible to increase profits.  Franklin and others worked specifically with Mariner and carried out the scheme.

67.     Laura Bailey also is a former Director of Sales at Joerns who pushed the fraudulent practices in working with SNFs, and securing contracts, at the direction of other Joerns' executives.  Eric Banaag is a Clinical Account Manager at Joerns and worked in the field directly with the SNFs in implementing the practices.

68.     Axiom, which consults with SNFs and provides cost reporting to the SNFs, was aware of investigations, including the Legacy audit.  An Axiom representative advised that the differential billing practices would be problematic for the SNFs, and warned Dynamic of this.  This Axiom representative advised Dynamic that he thought all nursing homes in California would be audited for mattress billing discrepancies.  Despite the warnings, Dynamic continued to invoice different prices for SOC and non-SOC patients, and Apostolou advised Relator not to discuss the audits with the SNF customers.  Apostolou claimed that if the differential billing ever came to light, it would be the SNFs' issue to deal with, not Dynamic's.

69.     Defendant SNF executives and agents approved and pushed the scheme, despite everyone knowing it was unlawful.  Relator is aware that Cambridge participated in the scheme from at least 2012 through 2017.  In 2016, Gordon Hodnett, was the Director of Purchasing at Cambridge.  He continued the scheme and further pushed invoicing SOC patients as much as possible at the higher rates, so Cambridge would not be responsible for the mattress payments, and would continue benefiting from heavily discounted "facility" rates that Dynamic and Joerns could afford due to huge profit margins on the SOC patient business.

70.     Relator is aware that Plum carried out the scheme with Dynamic/Invacare from at least 2012 through 2018.  Although Plum was audited in 2014 by DHCS for billing practices, it continued

to work with Dynamic until the end of 2018, following the same billing practices.  Mary Nieder was the former Director of Accounts Receivable at Plum.  Nieder approved the billing to Medi-Cal for all Plum patients, including of the differential billing to the SOC patient population, and was aware the billing was discriminatory.  Bryan Brockbank was a former Purchasing Manager at Plum.  He worked with Nieder who gave approval for SOC differential billing.  He was aware that the DHCS investigated Plum, and that the DHCS recouped funds for the billing practices.  He was tasked with attempting to collect over $325,000 from Dynamic for recoupment.

71.     Relator is aware that Mariner participated in the scheme from at least 2016 through 2018.  Dennis Sarcauga is the Executive Vice President of Operations at Mariner.  Sarcauga was aware of the billing practices and encouraged the discriminatory pricing of SOC patients because those patients carried the payment.  He approved the billing practices on behalf of Mariner.

72.     Relator is aware that Covenant participated in the scheme from at least 2016 through 2018.  Dava Ashley is the President of Covenant and formerly was the Clinical Director.  Ashley worked directly with Zierden from Joerns and approved Joerns' billing practices.

73.     Defendants and their agents have been aware for years of the aforementioned false billing practice and knowingly permitted such wrongful practices to continue.

74.     During the time frames above (and likely beyond, as discovery will establish), every claim submitted by Defendants to Medicare, Medi-Cal, or any other payor whose funds originate in whole or in part from the government, for any patient utilizing a bed, mattress, or other equipment supplied by Dynamic or Joerns, was false, because Joerns and Dynamic obtained the SNF business via illegal kickbacks in violation of the federal AKS statute (42 U.S.C. § 1320a-7b) and California Code, Welfare and Institutions Code (WIC) § 14107.2.

**D.     Defendants' Discriminatory Billing Practices Violate Federal and California Law**

75.     Defendants' actions violate the Anti-Kickback statute, which forbids persons from receiving any remuneration, including any kickback, bribe, or rebate in return for referring an individual to a person for the furnishing of any item or service, or in return for leasing any good for which payment may be made in whole or in part under a federal health care program.  42 U.S.C. § 1320a-7b.

76.     Similarly, Defendants' actions violate California Code, Welfare and Institutions Code (WIC) § 14107.2, which also forbids kickbacks.

77.     Defendants' actions further violate Medi-Cal's low price rules, which prohibit discriminatory billing.  Specifically, 22 California Code of Regulations ("CCR") § 51480(a) states "No provider shall bill or submit a claim for reimbursement for the rendering of health care services to a Medi-Cal beneficiary in any amount greater or higher than the usual fee charged by the provider to the general public for the same service."  Likewise, 22 CCR § 51501 states that, under the Medi-Cal program, "no provider shall charge for any service or any article more than would have been charged for the same service or article to other purchasers of comparable services or articles under comparable circumstances."

**E.      Defendants' "Qualifying Wound" Scheme Violated Medi-Cal's Low Price Rules.**

78.     As detailed above, and apart from the SOC scheme, Dynamic, Joerns, and Invacare billed Medi-Cal directly for patients with qualifying wounds that require specialty mattresses and equipment.  The rates for these patients was $18.76 per day, far higher than the rates charged to other patients in the facility segment.  Dynamic, Joerns, and Invacare's billing practices for "qualifying wound" patients violated the Medi-Cal low price rules set forth in 22 CCR §§ 51480 and 51501, among others.

**F.      Defendants' Kickbacks Induced the Referral of Medicare Business**

79.     Many SNF patients receive financial assistance from Medicare.  As detailed above, by providing deep discounts on the "facility" patients, Dynamic and Joerns assured that they would be the exclusive supplier of beds and other supplies to the SNFs.  This is an illegal *quid pro quo*, designed to induce the referral of all business, including Medicare business, in violation of the Anti-Kickback Law.

**G.      Further Evidence of the Scheme**

80.     Joerns, Dynamic, and Invacare entered into provider agreements with several SNFs through which they agreed to provide mattresses at discounted daily rates, even though they bill Medi-Cal a daily rate for such products of $18.76.

81.     For example, Dynamic's August 1, 2015 Provider Agreement with Queen Ann's Lace Holdings, LLC dba Whitney Oaks Care Center, which is owned by Plum, sets forth a daily rental rate for AirDyne Mattressses of $2.50 to $6.00.

82.     Dynamic's October 1, 2016 Preferred Provider Agreement with LAC Verdugo Operations LLC dba Glendale Post Acute Center sets forth daily rental rates of $6.00 to $8.50 for various alternating Pressure Mattresses.

83.     Dynamic's Preferred Provider Agreement with Breeze Health Care, Inc. dba Beachside Nursing Center, dated June 1, 2016, sets forth a daily rental rate of $6.00 for Airdyne pump with a standard size Dynamax Mattress.

84.     Dynamic's August 1, 2012 requirements contract with Jeffrey Pine Holdings, LLC dba Villa Las Palmas Healthcare Center, which is owned by Plum, sets forth a daily rental rate for AirDyne Mattresses of $5 to $6.

85.     Dynamics's November 30, 2011 provider agreement with Redlands Healthcare Center sets forth a daily rental rate for AirDyne Mattresses of $5.25 to $8.00.

86.     Dynamic emails demonstrate the entire purpose of the scheme was to induce SNFs to refer more business, and to capture the higher profit margins that the differential billing could provide.  For example, on March 16, 2017, Robert Husband, an account executive at Joerns, sent an email to Laura Bailey, the Director of Sales at Joerns, stating he wanted to convert one of his accounts, Fairfield Post Acute, from Joerns to Dynamic.  Husband explained:  "If we switch equipment to DMS [Dynamic] we can easily double our current revenue with this account by getting rid of the competition and **pushing the share of cost program**."  Bailey responded "I see no issue, we have a contract through DMS, we stand to gain business plus SOC and DMS has product they can provide."

87.     Due to increased audit activity by the State of California surrounding SOC issues, by 2018, several of Dynamic and Joerns' SNF customers became more risk averse and expressed concerns about the differential billing practices described above.

88.     For example, Dynamic received complaints about differential billing in August and September 2017 from Dycora Transitional Health, which operates 19 SNFs in California.

Specifically, Vicki Keyser, Dycora's Director of Business Office Operations, expressed concerns that SOC patients were being charged higher fees for mattresses than other types of patients.  Keyser demanded that "all of July's SOC invoices adjusted to the facility rates."

89.     Likewise, feeling the pressure of being caught, Cambridge also contacted Dynamic and Joerns in 2017 requesting that their SOC rates be set so that they were equal to their facility rates. Cambridge operates Nursing Home facilities in Northern and Southern California.

90.     Similarly, Plum, which operates up to 64 SNFs in the State of California, also expressed concerns about Dynamic's discriminatory billing.

91.     In September 2017, New Vista Health Services, which operates SNFs in Sunland, California, requested that Dynamic "fix the differential billing issues for SOC patients."  Dynamic had been renting mattresses to New Vista's non-SOC patients for $2.50 to $4.50 per day, well below the rate effectively billed to Medi-Cal.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violations of the Federal False Claims Act**

**Presenting False Claims**

**(31 U.S.C. § 3729(a)(1)(A))**

**On Behalf of the United States**

**Against All Defendants**

92.     Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

93.      Defendants knowingly caused to be presented false claims for payment or approval to an officer or employee of the United States.

94.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare and Medicaid program that were higher than they were permitted to claim or charge by applicable law.  Among

other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of illegal kickbacks.

95. Defendants knowingly made, used, and caused to be made and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

96. The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**SECOND CAUSE OF ACTION**

**Violations of the Federal False Claims Act**

**Making or Using False Records or Statements**

**Material to Payment or Approval of False Claims**

**(31 U.S.C. § 3729(a)(1)(B))**

**On Behalf of the United States**

**Against All Defendants**

97. Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

98. Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

99. Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare program that were higher than they were permitted to claim or charge by applicable law.  Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of illegal kickbacks.

100. Defendants knowingly made, used, and caused to be made and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

101.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### THIRD CAUSE OF ACTION

**Violations of the Federal False Claims Act**

**Conspiracy to Commit Violations of the False Claims Act**

**(31 U.S.C. § 3729(a)(1)(C))**

**On Behalf of the United States**

**Against All Defendants**

102.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

103.    Defendants conspired with each other and various other SNFs to commit the violations alleged in this complaint, including causes of action one and two, inclusive.

104.    Defendants performed acts, including agreeing to discounted prices to effect the object of the conspiracy.  As detailed above, each SNF knowingly entered into the differential pricing arrangements with Joerns and Dynamic described above.  Under those arrangements, the SNFs knew exactly how much Joerns and Dynamic were billing for SOC patients versus facility patients, for the same exact mattresses.  The SNFs thus knew that they were receiving deeply discounted pricing for the facility segment, and agreed in exchange to continue ordering mattresses from Joerns and Dynamic.  It was a simple *quid pro quo.*

105.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(C) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**FIRST AMENDED COMPLAINT; CASE NO. 17-cv-01757 LJO SAB**                                                        21

**FOURTH CAUSE OF ACTION**

**Violations of the California False Claims Act**

**Presenting False Claims**

**(Cal. Gov. Code § 12651, subd. (a)(1))**

**On Behalf of the State of California**

**Against All Defendants**

106.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

107.    Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to an officer or employee of the State of California.

108.    Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

109.    The State of California sustained damages because of Defendants' acts, in amounts to be proved at trial.

**FIFTH CAUSE OF ACTION**

**Violations of the California False Claims Act**

**Making or Using False Records or Statements to Obtain Payment or Approval of False Claims**

**(Cal. Gov. Code § 12651, subd. (a)(2))**

**On Behalf of the State of California**

**Against All Defendants**

110.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

111.    Defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims approved by the State of California, in violation of the California False Claims Act.

112.    Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims involving State funds, in violation of the California False Claims Act.

113.    Defendants' false records or statements had the natural tendency to influence, or capable of influencing, the payment or receipt of money, property, or services.

114.    The State of California sustained damages because of Defendants' acts, in amounts to be proven at trial.

### SIXTH CAUSE OF ACTION

**(In the Alternative)**

**Violations of the California False Claims Act**

**Inadvertent Submission of False Claims**

**(Cal. Gov. Code § 12651, subd. (a)(8))**

**On Behalf of the State of California**

**Against All Defendants**

115.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

116.    In the alternative, Defendants were the beneficiaries of inadvertent submissions of false claims, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of California within a reasonable time after discovery of the false claims.

117.    To the extent any of Defendants' complained of acts were inadvertent at the time committed, Defendants subsequently discovered they had engaged in discriminatory billing practices and failed to disclose the facts to the State of California within a reasonable time of such discovery.

118.    Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

119.    The State of California sustained damages because of Defendants' acts, in amounts to be proven at trial.

/ / /

/ / /

/ / /

/ / /

/ / /

**FIRST AMENDED COMPLAINT; CASE NO. 17-cv-01757 LJO SAB**                                                  23

1

**SEVENTH CAUSE OF ACTION**

2

**Violations of the California False Claims Act**

3

**Conspiracy**

4

**(Cal. Gov. Code § 12651, subd. (a)(3))**

5

**On Behalf of the State of California**

6

**Against All Defendants**

7
8

120.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

9
10

121.    Defendants conspired with each other and various other SNFs to commit the violations alleged in this complaint, including causes of action four, five and six, inclusive.

11
12
13
14
15
16
17

122.    Defendants performed acts, including agreeing to discounted prices for SOC patients to effect the object of the conspiracy.  As detailed above, each SNF knowingly entered into the differential pricing arrangements with Joerns and Dynamic described above.  Under those arrangements, the SNFs knew exactly how much Joerns and Dynamic were billing for SOC patients versus facility patients, for the same exact mattresses.  The SNFs thus knew that they were receiving deeply discounted pricing for the facility segment, and agreed in exchange to continue ordering mattresses from Joerns and Dynamic.  It was a simple *quid pro quo*.

18
19
20

123.    The conduct of Defendants violated California Government Code section 12651, subdivision (a)(3) and was a substantial factor in causing the State of California to sustain damages in an amount according to proof.

21

**VI.    PRAYER FOR RELIEF**

22
23

WHEREFORE, Plaintiff the United States of America, by and through Relator, prays for relief against all Defendants as follows:

24
25
26

1.    Pursuant to 31 U.S.C. § 3729(a)(1), three times the amount of damages the United States has sustained because of Defendants' acts in violation of the Federal False Claims Act, in an amount to be determined at trial.

27
28

2.    Pursuant to 31 U.S.C. § 3729(a)(1), the maximum allowed civil penalty for each violation of the Federal False Claims Act, in an amount to be determined at trial.

**FIRST AMENDED COMPLAINT; CASE NO. 17-cv-01757 LJO SAB**                24

3. Pursuant to 31 U.S.C. § 3729(a)(3), and all other applicable provisions of law, the costs of this action;

4. Prejudgment and postjudgment interest

5. Such further additional relief as the Court deems proper.

Plaintiff the State of California, by and through the Relator, prays for relief against all Defendants as follows:

1. Pursuant to California Government Code § 12651 (a), three times the amount of damages the State of California has sustained because of Defendants' acts in violation of the California False Claims Act, in an amount to be determined at trial.

2. Pursuant to California Government Code § 12651(a), the maximum allowed civil penalty for each violation of the False Claims Act, in an amount to be determined at trial.

3. Pursuant to California Government Code § 12651 (a), and all other applicable provisions of law, the costs of this action;

4. Prejudgment and postjudgment interest

5. Such further additional relief as the Court deems proper.

Further, Relator, on his own behalf, requests that he receive the maximum amount as permitted by law of the proceeds of this action or settlement of this action collected by the United States and/or the State of California, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

Dated: March 21, 2022                    **COTCHETT, PITRE & McCARTHY LLP**


By:   ___*/s/ Justin T. Berger*_____
      JUSTIN T. BERGER
      SARVENAZ (NAZY) FAHIMI

*Attorneys for Relators*

1

**VII.    JURY DEMAND**

2

Plaintiff demands a jury trial on all issues so triable.

3

4

Dated: March 21, 2022                    **COTCHETT, PITRE & McCARTHY LLP**

5

6                                         By:   ___*/s/ Justin T. Berger*_____
                                                JUSTIN T. BERGER
7                                               SARVENAZ (NAZY) FAHIMI

8                                         *Attorneys for Relators*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



## PROVIDER AGREEMENT

Jeffrey Pine Holdings, LLC, a California limited liability company dba Villa Las Palmas Healthcare Center ("Facility") and Dynamic Medical Systems LLC, a Nevada limited liability company ("Provider") enter into this primary provider agreement (this "Agreement") dated August 1, 2012, for the consideration and upon the terms and conditions set forth herein.

### RECITALS

WHEREAS, Facility owns and/or operates one or more healthcare facilities at the locations designated on Exhibit A hereto; and

WHEREAS, Provider is engaged in the business of providing the products, services and related supplies described on Exhibits B & C attached hereto (the "Resources"); and

WHEREAS, Provider and Facility wish to enter into this Agreement to provide the terms and conditions whereby Provider shall provide the Resources to Facility.

NOW, THEREFORE, it is agreed:

1.   **Requirements Contract; Scope**

    A.   Facility hereby agrees to fill its requirements for Resources from Provider, subject to any legal rights of patients of Facility to choose alternative providers; and, in consideration thereof, Provider hereby agrees to fill the requirements of Facility for the Resources in an efficient, timely and professional manner, in substantial compliance with all applicable government regulations and at the rates specified herein.   The initial prices for the Resources are set forth on Exhibits B & C hereto.

    B.   Although this Agreement covers only the specific locations referenced in Exhibit A hereto, Facility acknowledges and agrees that inclusion of other facilities owned, operated or otherwise controlled by Facility will allow greater economies of scale to Facility.   Accordingly, Facility shall notify Provider in the event it considers changing providers for such other facilities and allow Provider to suggest terms for serving such facilities under this Agreement or otherwise.

2.   **Term.**

The term of this Agreement shall be for an initial term of one (1) year from and after the Commencement Date.   For the purpose of this Agreement, the Commencement Date shall be *August 1, 2012*. Thereafter the Agreement will automatically be renewed for one

(1) year periods unless written notice is given by either party at least ninety (90) days prior to the then expiration date of the term of this Agreement of such party's intention not to renew the term of this Agreement. Provider may increase the prices for Resources as set forth in Exhibits B and C hereto by up to 3% each calendar year upon prior written notice to Facility.

3.   **Payment Terms.**

A.   Provider and Facility shall jointly determine whether specific Resources provided under this Agreement are to be reimbursed by Facility directly or whether Provider shall seek reimbursement from California Medi-Cal program ("Medi-Cal"), Medicare, or other third party payors for such Resources.

B.   For Resources charged directly to Facility, Facility is to remit payment to Provider within 30 days of receipt of invoice from Provider, including those residents who are receiving services for which Facility will seek reimbursement under Medicare, Medi-Cal/Medicaid, an HMO, or other governmental or third party payors. A 1.5% late fee (or such lesser maximum amount allowed by law) will be charged for any outstanding balance not paid by the 31st day of Facility's receipt of invoice from Provider, which fee shall accrue every thirty (30) days thereafter until payment is received by Provider. Facility's obligations to Provider shall accrue regardless of whether Facility receives reimbursement from third party payors for the provision of such Resources.

C.   For Resources charged to payors other than Facility, Provider reserves the right to determine and adjust fees charged for the Resources.

D.   Provider may seek Medi-Cal reimbursement directly for Medi-Cal Share of Cost for non-covered services as provided for in this Agreement and the Medi-Cal laws, regulations and provider manuals. Facility's Medi-Cal/Medicaid NPI Number is:   __1023048295__

   (i)   Medi-Cal Share of Cost. A resident who is a Medi-Cal beneficiary may charge the costs of Resources to his or her Medi-Cal share of cost. Facility, with consultation from Provider, assumes full responsibility for ensuring that Resources provided to residents under Medi-Cal share of cost are medically necessary, ordered by a physician and incorporated into the resident's plan of care. Facility agrees to be billed on behalf of the Medi-Cal recipient for Resources which are the subject of Treatment Authorization Request ("TAR") denials by the Department of Health Services field office or which are not submitted for TAR approval. Facility also agrees that if Resources are ordered for a qualifying resident, the share of cost can billed directly in accordance with the judgment and consent decree in the Johnson v. Rank court action and Medi-Cal policy without submission of a TAR. Facility will obtain the resident's authorization to use share of cost for the ordered product (Medi-Cal Form DHS6114). The parties agree that all pharmacy invoices, if any, will be deducted from a resident's share of cost prior to deducting any Resources. At no time will the Resources invoiced exceed a resident's share of cost less all pharmacy charges.

(ii)   All Medi-Cal/Medicaid residents who meet the general regulations used in adjudicating Treatment or Prior Authorization Requests will be serviced by Provider and billed accordingly.   Facility must provide the required documentation for each resident.   Services for all Medi-Cal/Medicaid residents that do not meet the Medi-Cal/Medicaid general regulations will be billed to Facility.

**4.   Breach or Default by Facility.**

If Facility does not pay the charges due hereunder or other amount required herein to be paid, fails to fulfill its responsibilities under Section 12 of this Agreement or otherwise breaches any of the terms or conditions of this Agreement, ceases doing business as a going concern, has a petition filed by or against it under any of the provisions of applicable bankruptcy laws then in effect, makes an assignment for the benefit of creditors, calls a general meeting of creditors or attempts any informal arrangement with creditors, or if a receiver or any officer of a court is appointed to have control of any Facility property, Provider shall have the right to exercise any one or more of the following remedies in order to protect its interests:

A.   Terminate this Agreement in whole or in part;

B.   Declare all unpaid charges to be immediately due and payable;

C.   Take possession of any or all Resources (30 days after notice is given), wherever the same be located, without demand, without any court order or other process of law and without liability to Facility for any damages occasioned by such taking of possession; or

D.   Pursue any other remedies existing at law or in equity.

**5.   Breach of Default by Provider.**

This Agreement can be terminated by Facility by at least thirty (30) days prior written notice in the event of (i) a breach of default by Provider of its duties hereunder, which breach or default has not been cured within one hundred eighty (180) days of written notice delivered by Facility to Provider specifying, in sufficient detail for corrective action, the claimed default by Provider, (ii) any violation of applicable laws or regulations, termination of any license, permit or other registration, or violation of the eligibility requirements for reimbursement under any government program by Provider, which violation or termination has a material impact on Provider's ability to perform its duties hereunder or (iii) the occurrence or existence of any condition, practice, procedure, action, inaction or omission of, by or involving Provider which, in the reasonable opinion of Facility, constitutes either a threat to the health, safety and welfare of any patient, resident and/or employee or a violation of any law or regulation governing Facility's operation.

**6.   Facility Indemnification.**

Provider agrees to indemnify and hold Facility harmless against any and all claims, liabilities, damages and expenses, including without limitation, reasonable attorneys fees incurred by the party seeking indemnification in defending, or compromising actions

brought against the party seeking indemnification or its officers, directors, employees agents and contractors arising out of or related to the acts or omissions of Provider or its employees, agents, and contractors in connection with the provision of services under this Agreement. Facility shall cooperate in the defense of any such claim, suit, action, or proceeding.

7. **Provider Indemnification.**

Facility agrees to indemnify and hold Provider and its officers, directors, employees, agents and contractors harmless against any and all claims, liabilities, damages and expenses, including without limitation, reasonable attorneys fees incurred by the party seeking indemnification in defending, or compromising actions brought against the party seeking indemnification or its officers, directors, employees agents and contractors arising out of or related to the acts or omissions of Facility or its employees, agents, and contractors in connection with the provision of services under this Agreement. Provider shall cooperate in the defense of any such claim, suit, action, or proceeding.

8. **Liability Coverage.**

Provider and Facility shall each maintain comprehensive general liability insurance at minimum levels of $1,000,000 per occurrence and $3,000,000 aggregate. Provider and Facility shall each provide the other party with written evidence of such insurance coverage upon request.

9. **Governing Law, Jurisdiction, Venue. Attorney's Fees and Costs.**

This Agreement shall be governed by and construed under the laws of the State of California. In the event of any dispute relating to this Agreement, the parties hereto, regardless of their residence, shall be subject to the jurisdiction of the courts of the State of California. The parties further agree that this Agreement is made and entered into in Los Angeles County, California, and regardless of where this contract is to be performed, the parties agree that the state and federal courts located in Los Angeles County, California, have venue for the purposes of litigating any dispute, controversy or proceeding arising out of or related to this Agreement. If any action or arbitration proceeding is brought to interpret or enforce the terms of this Agreement, the prevailing party will be entitled to recover its attorneys fees and costs, including, but not limited to, forum, private judge and arbitrator fees.

10. **Assignment.**

Provider shall be entitled to assign its rights under this Agreement to a sub-contractor, any affiliate of Provider, and to any company that acquires the business of Provider through acquisition or merger, without the consent of Facility. Facility may not assign its rights under this Agreement without the prior written consent of Provider. Notwithstanding the foregoing, the parties hereto agree that this Agreement shall be binding on any party that acquires the business of Facility in whole or in part through sale of equity, assets, merger, consolidation or other restructuring and/or assumes responsibility for or control over any of the facilities subject to this Agreement by management agreement or other contractual arrangement.

11.  **Confidentiality Obligations; Records**

A.  <u>Confidential Health Information</u>.  Provider and Facility acknowledge that confidential patient records and other information that may constitute Protected Health Information (as defined under the Health Insurance Portability and Accountability Act ("HIPAA")) may be shared between the parties and their respective employees and agents pursuant to this Agreement.  Provider and Facility shall each maintain the confidentiality of all patient information exchanged hereunder in accordance with all state and federal requirements, including, without limitation, the requirements of HIPAA and shall enter into a business associate agreement if necessary.

B.  <u>Other Confidentiality Obligations</u>.  Facility agrees that the forms, manuals, pricing and billing information and other non-public information and materials received by Facility from Provider are proprietary to Provider and will not be duplicated, used (except pursuant to the provisions of this Agreement) or disclosed to third parties without the prior written consent of Provider.  Facility also agrees that the form and content of this Agreement will not be disclosed to third parties without the prior written consent of Provider.

C.  <u>Access to Records</u>.  During the term of this Agreement, and for a period of 4 years thereafter (or any longer period stipulated by applicable law), each party shall upon reasonable request be provided copies of the other party's patient records and other records relating to the services provided under this Agreement for purposes of treating patients, receiving payment for services provided (whether from Facility or other third party or governmental payors), health care operations or other lawful purposes in connection with this Agreement or as necessary to comply with audits or other investigations, but only to the extent such access may be given in compliance with all applicable laws and regulations governing the use and confidentiality of such records.  Each party reserves the right to require payment from the other party of its reasonable costs to provide any physical or electronic copies of such records.

12.  **Facility Responsibility.** Facility shall:

A.  Fulfill its obligations under this Agreement in a timely, efficient and professional manner and in compliance with all applicable laws and regulations.

B.  Obtain all necessary treatment authorization requests ("TAR") or other prior authorizations required by governmental and other third party payors in order for either Facility or Provider to seek reimbursement for the Resources.

C.  Notify Provider promptly as to any changes in a resident's status, including but not limited to changes in billing status or discharge, for any resident receiving service under this Agreement within forty-eight (48) hours of such change.  Facility agrees to supply Provider within five (5) days of request (written or oral), all available resident information requested by Provider and also provide a completed Utilization/Billing matrix at the end of each month.

D.  Maintain all Resources supplied by Provider clean and free from misuse or abuse and disinfect all rental Resources prior to being switched to a new resident.

E.  Compensate Provider for the repair or replacement cost of any lost or damaged equipment at Provider's sole discretion. .

F.  Use and operate the equipment in accordance with all instructions and user manuals and take all reasonable and appropriate measures to minimize any risks assocaited with the use of the Resources.

G.  Provide properly trained and licensed caregivers to monitor the safe use of the Resources.

H.  Ensure that the Resources are properly prescribed or designated for use to the specific patient's needs.

I.  Provide Provider with access to all resident charts and medical records on residents covered under Third Party billing program and accumulate resident usage on all Resources provided.

J.  Sign Provider's authorization request/delivery ticket and any other paperwork reasonably requested by Provider upon Facility's acceptance of any Resources.

K.  Determine the PAR levels, clean, store and set up PAR equipment and track PAR mattress utilization for Resources provided in connection with the PAR Program outlined in Section 13(B) below.

13.  **Provider Responsibility. Provider shall:**

A.  Provide equipment on a prompt and timely basis, in accordance with accepted professional practices and in compliance with all state and federal laws. Rental or sales charges shall begin to accrue on the day the Resources are placed at Facility and with respect to each order shall continue until Provider is notified either verbally or in writing to remove the Resources. Provider's normal hours of operation are 7:00 a.m. to 8:00 p.m., Monday through Friday. Twenty-four hour EMERGENCY ONLY service is available by dialing 800-225-9080 after hours, Saturday, Sunday and holidays. Emergency requests will be handled by Provider's on-duty personnel.

B.  Assist Facility to implement a mattress rapid response rental program (the "PAR Program") whereby Provider shall deliver an agreed upon number of mattresses to Facility, and Facility shall be responsible for transferring mattresses between Facility's residents as necessary and appropriate. Facility shall pay the rental rates for all mattresses within the PAR Program regardless of whether such mattresses are being used by a resident at all times. Provider will reference prior historical utilization data to assist Facility in determining appropriate PAR level, will monitor all PAR placements and periodically discuss necessary changes to the PAR level with Facility. Provider will also assist Facility with conversion to third party billing when needed.

C.  Provide a Utilization/Billing Matrix to Facility. The Matrix will be provided 7-10 days prior to each month-end. This will allow Facility to notify Provider of any changes during the month so that Provider can make the necessary changes to

ensure that Facility's invoices will reflect the correct billing status and dates of service.

D.      E-mail or fax a billing invoice to Facility approximately the third (3rd) business day of the month.

E.      Provide confirmation numbers when Facility requests an equipment delivery, pick-up or service.

F.      Provide copies of Provider's Policy and Procedure Manuals and/or Quality Assurance monitoring tools. Updates to the Policies and Procedures will be provided as changes occur.

G.      Provider shall not be obligated to provide any clinical consulting services in connection with the Resources unless the parties executed a separate agreement or addendum relating to such services.

14.   **Warranty**

A.      Limited Warranty; Exclusion of Other Warranties. THIS LIMITED WARRANTY IS THE SOLE WARRANTY PROVIDED BY PROVIDER WITH RESPECT TO THE PRODUCTS.   NO SALES BROCHURE OR OTHER PROMOTIONAL LITERATURE SHALL CONSTITUTE A GUARANTY OR WARRANTY BY PROVIDER.   PROVIDER WARRANTS THAT THE PRODUCTS WILL OPERATE   SUBSTANTIALLY   IN   CONFORMANCE   WITH   THE MANUFACTURER PUBLISHED SPECIFICATIONS WHEN SUBJECT TO NORMAL, PROPER AND INTENDED USAGE BY PROPERLY TRAINED PERSONNEL.   MANUFACTURER PUBLISHED SPECIFICATIONS ARE AVAILABLE UPON REQUEST. IF ANY OF THE PRODUCTS ARE FOUND TO BE DEFECTIVE, SUCH PRODUCTS WILL, AT PROVIDER'S OPTION, BE REPAIRED AT PROVIDER'S COST OR BE REPLACED. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED AND PROVIDER DISCLAIMS ANY WARRANTY OF ANY OTHER KIND, INCLUDING ANY WARRANTY THAT THE PRODUCTS ARE MERCHANTABLE OR FIT FOR A PARTICULAR PURPOSE.   PROVIDER DOES NOT WARRANT THAT THE PRODUCTS ARE ERROR-FREE OR WILL ACCOMPLISH ANY PARTICULAR RESULT.

B.      Limitation of Liability. Provider's liability (whether under the theories of breach of contract or warranty, negligence or strict liability or otherwise) under this Agreement shall be limited as set forth above.   IN NO EVENT SHALL PROVIDER'S LIABILITY EXCEED THE RENTAL OR PURCHASE PRICE OF THE PRODUCTS.

C.      Disclaimer of Consequential Damages. IN NO EVENT SHALL PROVIDER BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, BREACH OF ANY OBLIGATION OR WARRANTY IMPOSED ON PROVIDER HEREUNDER.   Consequential damages shall include, without limitation, loss of use, income or profit, or loss sustained as the result of injury to

any person, or loss or damage to any property, or loss or damage sustained as the result of work stoppage.

17. **Miscellaneous Provisions**

A.   Notices. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly delivered either i) when delivered (by hand or by overnight nationally recognized mail service) to the other party or ii) three (3) business days after the same have been deposited in a United States post office, with first class postage prepaid and addressed to the parties as follows or at such address as the party may have previously provided in writing:

To Provider:   Dynamic Medical Systems, LLC
2811 E Ana Street
Rancho Dominguez, CA 90221
Attn:   Contract Administrator
Phone:  800-225-9080
Fax:     866-896-7317

To Facility:   Jeffrey Pine Holdings, LLC
dba Villa Las Palmas Healthcare Center
622 S Anza St
El Cajon, CA 92020
Attn: Dan Gill – Administrator
Phone: 619 442-0544

B.   Force Majeure.  Facility agrees not to hold Provider responsible for deliveries or services that are not performed due to acts of God or other circumstances or occurrences that are out of Provider's control.

C.   Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held illegal, unenforceable or invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid, illegal or unenforceable shall not be affected thereby.

D.   Successors and Assigns.  Each and all of the provisions hereof shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

E.   Integration. This Agreement constitutes the entire understanding between the parties with respect to the subject matter described herein, and supersedes all prior negotiations, discussions, agreements or understandings, whether written, implied or oral.

F.   Modification of Agreement.  Any amendment or modification of or supplement to this Agreement must be in writing, expressly identifying this Agreement and the portion or portions thereof which are subject to modification, and signed by the

parties. This Agreement may not be modified, altered or added to by conduct, oral agreement, estoppels, waiver or otherwise.

G.   Fair Market Value. The amounts to be paid to Provider hereunder have been determined by the parties through good faith and arms-length bargaining to be the fair market value of the services to be rendered hereunder. No amount paid or to be paid hereunder is intended to be, nor will it be construed as, an offer, inducement or payment, whether directly or indirectly, overtly or covertly, for the referral of patients by Provider to Facility, or by Facility to Provider, or for the recommending or arranging of the purchase, lease or order of any item or service. For purposes of this section, Provider and Facility will include each such person or entity and any affiliate thereof.

H.   Business Review. If more than 5 facilities are listed on Exhibt A or, if as a result of this Agreement, monthly revenue from all payer sources exceeds $10,000, the parties will meet at least semi-annually to review the objectives and activities relating to this Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates appearing under their respective signatures.

Facility:
Jeffrey Pine Holdings, LLC
dba Villa Las Palmas Healthcare Center

By: _____
Dan Gill - Administrator

Date: _____ 10-16-13 _____

Provider:

Dynamic Medical Systems, LLC

By: _____
Darren Thieding - **Vice** President
Invacare Outcomes Management LLC

Date: _____ 10/16/13 _____

Account Manager:
Account Representative:

{01274079.DOC;3 }

# EXHIBIT A

**Facility Name/s and Address/es:**

Jeffrey Pine Holdings, LLC
dba Villa Las Palmas Healthcare Center
622 S Anza St
El Cajon, CA 92020
Attn: Dan Gill – Administrator

## EXHIBIT B

**Product**

| | Tier I Rental Rate (Month 1 - 3) | Tier II Rental Rate (Month 4 or Greater) |
|---|---|---|
| **Tiered Daily Rental Rates** | | |
| AirDyne with or without Bolster | $ 6.00 per day | $ 5.00 per day |
| MA 65 with or without Bolster | $ 6.00 per day | $ 5.00 per day |
| MA 85 with or without Bolster | $ 8.00 per day | $ 7.00 per day |
| **Standard Daily Rental Rates** | | |
| Bariatric Low Air Loss Mattress | | $ 13.00 per day |
| Bariatric Low Air Loss Mattress with Bolster | | $ 14.50 per day |
| Rotation Therapy Mattress (DynaTurn) | | $ 15.00 per day |
| Bariatric Rotation Therapy Mattress Bariatric DynaTurn) | | $ 20.00 per day |
| Air Powered Lateral Transfer System | | $ 15.00 per day |
| Bariatric Air Powered Lateral Transfer System | | $ 21.00 per day |
| Bariatric Bed Frame (750lb capacity) | | |
|     W / Pressure Reducing Foam Mattress | | $ 22.50 per day |
|     W / Pressure Relieving Air Mattress | | $ 32.50 per day |
|     Full Scales for Bariatric Bed frame | | $ 3.00 per day |
| Bariatric Commode | | $ 4.00 per day |
| Bariatric Wheelchair (all sizes) | | $ 5.50 per day |
| Bariatric Walker | | $ 2.00 per day |
| Bariatric Lift | | $ 18.00 per day |
| Bariatric Trapeze (freestanding) | | $ 3.00 per day |
| Bariatric Trapeze (bed mounted > 750lb capacity frame) | | $ 3.00 per day |
| Continuous Passive Motion Machine | | $ 13.00 per day |
| MobIVac Negative Pressure Wound Therapy System - Pump | | $ 42.00 per day |
| Semi-Electric Bed Frame | | $120.00 per month |
| Extra Long | | $130.00 per month |

Hi-Low Bed Frame                                                    $160.00 per month

Note: Medi-Cal residents will be eligible to remain on the product if they have a minimum of $240.00 or more available via share of cost (under Johnson vs. Rank), or, any other alternate payment source.

Tiered pricing is implemented based on the following criteria:

    a)  The Tier II is applicable to continuous patient specific rental charges for the AirDyne, MA 65 and MA85 with or without a bolster.

    b)  The Tier II discount applies only to rentals billed to and paid by each facility and does not apply to 3rd party billing.

    c)  Tier price changes are effective on the first day of the calendar month immediately following the completion of each tier period.

    d)  Measurement for the various tiers begins on the commencement date of a signed provider agreement.

## EXHIBIT C

| Preventative Products | MSRP |
|---|---|
| MoblVac NPWT TruSeal Link Woundcare Kit (Economy) | $ 28.50 |
| MoblVac NPWT TruSeal Link Woundcare Kit (Value) | $ 30.00 |
| MoblVac NPWT TruSeal Link Woundcare Kit (Small Round Drain) | $ 28.50 |
| MoblVac NPWT TruSeal Link Woundcare Kit (Medium Round Channel Drain) | $ 47.30 |
| Moblvac NPWT TruSeal Link Woundcare Kit (X-large Round Drain) | $ 40.55 |
| Moblvac NPWT TruSeal Link Seal Kit | $ 15.00 |
| Moblvac NPWT Tubing Set with Y Connector | $ 4.00 |
| Moblvac NPWT Collection Canister with Solidifier | $ 25.00 |
| MoblVac NPWT Nylon Transport Bag | $ 90.00 |
| MoblVac NPWT Pole Clamp | $ 70.00 |
| Alternating Pressure Pad | $ 140.00 |
| SafetyDyne Sentry Foam Mattress | $ 235.00 |
| SafetyDyne Sentinel Foam Mattress | $ 295.00 |
| SafetyDyne Defender Foam Mattress | $ 355.00 |
| SafetyDyne Sloped Heel Option (all styles) | $ 6.00 |
| SafetyDyne Raised Perimeter Siderail w/ingress/egress cut-out (all styles) | $ 34.00 |
| Maxifloat Heavyweight Foam Mattress | $ 700.00 |
| Body Float I- 76", 80" or 84" long | $ 175.00 |
| Body Float I with Raised Rails - 76", 80" or 84" long | $ 200.00 |
| Body Float II - 76", 80" or 84" long With memory foam (AKA visco foam) in heel section | $ 225.00 |
| Body Float II with Raised Rails - 76", 80" or 84" long With memory foam (AKA visco foam) in heel section | $ 250.00 |
| Wedge foam cushion | $ 45.00 |
| Wedge pommel cushion | $ 80.00 |
| Wedge deluxe | $ 70.00 |
| Side Rail Pads (soft) | $ 125.00 |

| | |
|---|---|
| Heel Protectors | $ 25.00 |
| Foot Elevators (Foam) | $ 25.00 |
| Foot hugger/extender for wheelchair | $ 65.00 |
| Padded lap tray for wheelchair | $ 75.00 |
| Pads for wheelchair arm | $ 60.00 |
| Lap buddy for wheelchair | $ 48.00 |

All "supplies" orders on Exhibit "C" must be a minimum of $ 600.00 per order to each Facility. If orders do not meet this minimum there will be a delivery charge of $55 for non-urgent Provider deliveries and $125 for urgent deliveries. Urgent deliveries must get approval of the administrator if available.

EXHIBIT B



## PROVIDER AGREEMENT

Queen Ann's Lace Holdings, LLC, a California limited liability company dba Whitney Oaks Care Center ("Facility") and Dynamic Medical Systems LLC, a Nevada limited liability company ("Provider") enter into this primary provider agreement (this "Agreement") dated August 1, 2015, for the consideration and upon the terms and conditions set forth herein.

RECITALS

WHEREAS, Facility owns and/or operates one or more healthcare facilities at the locations designated on Exhibit A hereto; and WHEREAS, Provider is engaged in the business of providing the products, services and related supplies described on Exhibits B attached hereto (the "Resources"); and
WHEREAS, Provider and Facility wish to enter into this Agreement to provide the terms and conditions whereby Provider shall provide the Resources to Facility.

NOW, THEREFORE, it is agreed:

1.  **Requirements Contract; Scope**

    A.  Facility hereby agrees to fill its requirements for Resources from Provider, subject to any legal rights of patients of Facility to choose alternative providers; and, in consideration thereof, Provider hereby agrees to fill the requirements of Facility for the Resources in an efficient, timely and professional manner, in substantial compliance with all applicable government regulations and at the rates specified herein. The initial prices for the Resources are set forth on Exhibits B hereto.

    B.  Although this Agreement covers only the specific locations referenced in Exhibit A hereto, Facility acknowledges and agrees that inclusion of other facilities owned, operated or otherwise controlled by Facility will allow greater economies of scale to Facility. Accordingly, Facility shall notify Provider in the event it considers changing providers for such other facilities and allow Provider to suggest terms for serving such facilities under this Agreement or otherwise.

2.  **Term.**

    The term of this Agreement shall be for an initial term of three (3) years from and after the Commencement Date. For the purpose of this Agreement, the Commencement Date shall be August 1, 2015. Thereafter the Agreement will automatically be renewed for one (1) year periods unless written notice is given by either party at least ninety (90) days prior to the then expiration date of the term of this Agreement of such party's intention not to renew the term of this Agreement. Provider may increase the prices for Resources as set forth in Exhibits B hereto by up to 3% on each calendar year upon prior written notice to the Facility.

3.  **Payment Terms.**

    A.  Provider and Facility shall jointly determine whether specific Resources provided under this Agreement are to be reimbursed by Facility directly or whether Provider shall seek

reimbursement from California Medi-Cal program ("Medi-Cal"), Medicare, or other third party payors for such Resources.

B.  For Resources charged directly to Facility, Facility is to remit payment to Provider within 30 days of receipt of invoice from Provider, including those residents who are receiving services for which Facility will seek reimbursement under Medicare, Medi-Cal/Medicaid, an HMO, or other governmental or third party payors.  A 1.5% late fee (or such lesser maximum amount allowed by law) will be charged for any outstanding balance not paid by the 31st day of Facility's receipt of invoice from Provider, which fee shall accrue every thirty (30) days thereafter until payment is received by Provider.   Facility's obligations to Provider shall accrue regardless of whether Facility receives reimbursement from third party payors for the provision of such Resources.

C.  For Resources charged to payors other than Facility, Provider reserves the right to determine and adjust fees charged for the Resources.

D.  Provider may seek Medi-Cal reimbursement directly for Medi-Cal Share of Cost for non-covered services as provided for in this Agreement and the Medi-Cal laws, regulations and provider manuals. Facility's Medi-Cal/Medicaid NPI Number is:  1134427362.

    (i)  Medi-Cal Share of Cost. A resident who is a Medi-Cal beneficiary may charge the costs of Resources to his or her Medi-Cal share of cost. Facility, with consultation from Provider, assumes full responsibility for ensuring that Resources provided to residents under Medi-Cal share of cost are medically necessary, ordered by a physician and incorporated into the resident's plan of care. Facility agrees to be billed on behalf of the Medi-Cal recipient for Resources which are the subject of Treatment Authorization Request ("TAR") denials by the Department of Health Services field office or which are not submitted for TAR approval. Facility also agrees that if Resources are ordered for a qualifying resident, the share of cost be can billed directly in accordance with the judgment and consent decree in the <u>Johnson v. Rank</u> court action and Medi-Cal policy without submission of a TAR. Facility will obtain the resident's authorization to use share of cost for the ordered product (Medi-Cal Form DHS6114). The parties agree that all pharmacy invoices, if any, will be deducted from a resident's share of cost prior to deducting any Resources. At no time will the Resources invoiced exceed a resident's share of cost less all pharmacy charges.

    (ii)  All Medi-Cal/Medicaid residents who meet the general regulations used in adjudicating Treatment or Prior Authorization Requests will be serviced by Provider and billed accordingly.   Facility must provide the required documentation for each resident. Services for all Medi-Cal/Medicaid residents that do not meet the Medi-Cal/Medicaid general regulations will be billed to Facility.

4.  **Breach or Default by Facility.**

If Facility does not pay the charges due hereunder or other amount required herein to be paid, fails to fulfill its responsibilities under Section 12 of this Agreement or otherwise breaches any of the terms or conditions of this Agreement, ceases doing business as a going concern, has a petition filed by or against it under any of the provisions of applicable bankruptcy laws then in effect, makes an assignment for the benefit of creditors, calls a general meeting of creditors or attempts any informal arrangement with creditors, or if a receiver or any officer of a court is appointed to have control of any Facility property, Provider shall have the right to exercise any one or more of the following remedies in order to protect its interests:

A.  Terminate this Agreement in whole or in part;

B.  Declare all unpaid charges to be immediately due and payable;

C.   Take possession of any or all Resources (30 days after notice is given), wherever the same be located, without demand, without any court order or other process of law and without liability to Facility for any damages occasioned by such taking of possession; or

D.   Pursue any other remedies existing at law or in equity.

5.   **Breach of Default by Provider.**

This Agreement can be terminated by Facility by at least thirty (30) days prior written notice in the event of (i) a breach of default by Provider of its duties hereunder, which breach or default has not been cured within one hundred eighty (180) days of written notice delivered by Facility to Provider specifying, in sufficient detail for corrective action, the claimed default by Provider, (ii) any violation of applicable laws or regulations, termination of any license, permit or other registration, or violation of the eligibility requirements for reimbursement under any government program by Provider, which violation or termination has a material impact on Provider's ability to perform its duties hereunder or (iii) the occurrence or existence of any condition, practice, procedure, action, inaction or omission of, by or involving Provider which, in the reasonable opinion of Facility, constitutes either a threat to the health, safety and welfare of any patient, resident and/or employee or a violation of any law or regulation governing Facility's operation.

6.   **Facility Indemnification.**

Provider agrees to indemnify and hold Facility harmless against any and all claims, liabilities, damages and expenses, including without limitation, reasonable attorneys fees incurred by the party seeking indemnification in defending, or compromising actions brought against the party seeking indemnification or its officers, directors, employees agents and contractors arising out of or related to the acts or omissions of Provider or its employees, agents, and contractors in connection with the provision of services under this Agreement. Facility shall cooperate in the defense of any such claim, suit, action, or proceeding.

7.   **Provider Indemnification.**

Facility agrees to indemnify and hold Provider and its officers, directors, employees, agents and contractors harmless against any and all claims, liabilities, damages and expenses, including without limitation, reasonable attorneys fees incurred by the party seeking indemnification in defending, or compromising actions brought against the party seeking indemnification or its officers, directors, employees agents and contractors arising out of or related to the acts or omissions of Facility or its employees, agents, and contractors in connection with the provision of services under this Agreement. Provider shall cooperate in the defense of any such claim, suit, action, or proceeding.

8.   **Liability Coverage.**

Provider and Facility shall each maintain comprehensive general liability insurance at minimum levels of $1,000,000 per occurrence and $3,000,000 aggregate.  Provider and Facility shall each provide the other party with written evidence of such insurance coverage upon request.

9.   **Governing Law, Jurisdiction, Venue. Attorney's Fees and Costs.**

This Agreement shall be governed by and construed under the laws of the State of California. In the event of any dispute relating to this Agreement, the parties hereto, regardless of their residence, shall be subject to the jurisdiction of the courts of the State of California.  The parties further agree that this Agreement is made and entered into in Los Angeles County, California, and regardless of where this contract is to be performed, the parties agree that the state and federal courts located in Los Angeles County, California, have venue for the purposes of litigating any dispute, controversy or proceeding arising out of or related to this Agreement.  If any action or arbitration proceeding is brought to interpret

or enforce the terms of this Agreement, the prevailing party will be entitled to recover its attorneys fees and costs, including, but not limited to, forum, private judge and arbitrator fees.

10.   **Assignment.**

Provider shall be entitled to assign its rights under this Agreement to a sub-contractor, any affiliate of Provider, and to any company that acquires the business of Provider through acquisition or merger, without the consent of Facility. Facility may not assign its rights under this Agreement without the prior written consent of Provider. Notwithstanding the foregoing, the parties hereto agree that this Agreement shall be binding on any party that acquires the business of Facility in whole or in part through sale of equity, assets, merger, consolidation or other restructuring and/or assumes responsibility for or control over any of the facilities subject to this Agreement by management agreement or other contractual arrangement.

11.   **Confidentiality Obligations; Records**

A.   <u>Confidential Health Information</u>.  Provider and Facility acknowledge that confidential patient records and other information that may constitute Protected Health Information (as defined under the Health Insurance Portability and Accountability Act ("HIPAA")) may be shared between the parties and their respective employees and agents pursuant to this Agreement. Provider and Facility shall each maintain the confidentiality of all patient information exchanged hereunder in accordance with all state and federal requirements, including, without limitation, the requirements of HIPAA and shall enter into a business associate agreement if necessary.

B.   <u>Other Confidentiality Obligatio</u>ns.  Facility agrees that the forms, manuals, pricing and billing information and other non-public information and materials received by Facility from Provider are proprietary to Provider and will not be duplicated, used (except pursuant to the provisions of this Agreement) or disclosed to third parties without the prior written consent of Provider. Facility also agrees that the form and content of this Agreement will not be disclosed to third parties without the prior written consent of Provider.

C.   <u>Access to Records</u>.  During the term of this Agreement, and for a period of 4 years thereafter (or any longer period stipulated by applicable law), each party shall upon reasonable request be provided copies of the other party's patient records and other records relating to the services provided under this Agreement for purposes of treating patients, receiving payment for services provided (whether from Facility or other third party or governmental payors), health care operations or other lawful purposes in connection with this Agreement or as necessary to comply with audits or other investigations, but only to the extent such access may be given in compliance with all applicable laws and regulations governing the use and confidentiality of such records. Each party reserves the right to require payment from the other party of its reasonable costs to provide any physical or electronic copies of such records.

12.   **Facility Responsibility.**  Facility shall:

A.   Fulfill its obligations under this Agreement in a timely, efficient and professional manner and in compliance with all applicable laws and regulations.

B.   Obtain all necessary treatment authorization requests ("TAR") or other prior authorizations required by governmental and other third party payors in order for either Facility or Provider to seek reimbursement for the Resources.

C.   Notify Provider promptly as to any changes in a resident's status, including but not limited to changes in billing status or discharge, for any resident receiving service under this Agreement within forty-eight (48) hours of such change. Facility agrees to supply Provider within five (5) days of request (written or oral), all available resident information requested by Provider and also provide a completed Utilization/Billing matrix at the end of each month.

{01274079.DOC;3 }

D.  Maintain all Resources supplied by Provider clean and free from misuse or abuse and disinfect all rental Resources prior to being switched to a new resident.

E.  Compensate Provider for the repair or replacement cost of any lost or damaged equipment at Provider's sole discretion. .

F.  Use and operate the equipment in accordance with all instructions and user manuals and take all reasonable and appropriate measures to minimize any risks assocaited with the use of the Resources.

G.  Provide properly trained and licensed caregivers to monitor the safe use of the Resources.

H.  Ensure that the Resources are properly prescribed or designated for use  to the specific patient's needs.

I.  Provide Provider with access to all resident charts and medical records on residents covered under Third Party billing program and accumulate resident usage on all Resources provided.

J.  Sign Provider's authorization request/delivery ticket and any other paperwork reasonably requested by Provider upon Facility's acceptance of any Resources.

K.  Determine the PAR levels, clean, store and set up PAR equipment and track PAR mattress utilization for Resources provided in connection with the PAR Program outlined in Section 13(B) below.

13.  **Provider Responsibility.  Provider shall:**

A.  Provide equipment on a prompt and timely basis, in accordance with accepted professional practices and in compliance with all state and federal laws.  Rental or sales charges shall begin to accrue on the day the Resources are placed at Facility and with respect to each order shall continue until Provider is notified either verbally or in writing to remove the Resources. Provider's normal hours of operation are 7:00 a.m. to 8:00 p.m., Monday through Friday. Twenty-four hour EMERGENCY ONLY service is available by dialing 800-225-9080 after hours, Saturday, Sunday and holidays.  Emergency requests will be handled by Provider's on-duty personnel.

B.  Assist Facility to implement a mattress rapid response rental program (the "PAR Program") whereby Provider shall deliver an agreed upon number of mattresses to Facility, and Facility shall be responsible for transferring mattresses between Facility's residents as necessary and appropriate.  Facility shall pay the rental rates for all mattresses within the PAR Program regardless of whether such mattresses are being used by a resident at all times.   Provider will reference prior historical utilization data to assist Facility in determining appropriate PAR level, will monitor all PAR level placements and periodically discuss necessary changes to the PAR level with Facility.  Provider will also assist Facility with conversion to third party billing when needed.

C.  Provide a Utilization/Billing Matrix to Facility.  The Matrix will be provided 7-10 days prior to each month-end.  This will allow Facility to notify Provider of any changes during the month so that Provider can make the necessary changes to ensure that Facility's invoices will reflect the correct billing status and dates of service.

D.  E-mail or fax a billing invoice to Facility approximately the third (3rd) business day of the month.

E.  Provide confirmation numbers when Facility requests an equipment delivery, pick-up or service.

F.  Provide copies of Provider's Policy and Procedure Manuals and/or Quality Assurance monitoring tools. Updates to the Policies and Procedures will be provided as changes occur.

G.  Provider shall not be obligated to provide any clinical consulting services in connection with the Resources unless the parties executed a separate agreement or addendum relating to such services.

14.  **Responsibilities of Both Parties:**

A.  Both parties represent and warrant that:

B.  Neither party has been convicted of any offense related to healthcare or the provision of services paid for by Medicare, Medicaid, or any other federal or state healthcare program, or excluded from participation in Medicare or Medicaid or any other federal or state healthcare program;

C.  Neither party is a party to any agreement or arrangement that would be violated or breached by the execution or delivery of this Agreement or the performance of any of the obligations under this Agreement, or that requires the consent of any third party (government or other) to enter into or perform any of the obligations under this Agreement;

D.  They are, and throughout the term of this Agreement shall remain, qualified to participate in Medicare, Medicaid and such other federal or state healthcare programs as may be required by them from time to time;

E.  They shall abide by the policies, procedures, and rules as established by either party hereto; and

F.  The parties agree to comply with applicable state, local and federal laws, rules and regulations, including without limitation those under Health Insurance Portability and Accountability Act or Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C 117, the Federal False Claims Act, any policy and procedure statements that may be issued by those bodies, and the following:

G.  Title VI of the Civil Rights act of 1964 (PL 88-352) and all requirements imposed by applicable regulations of the US Department of Health and Human Services regarding discrimination on the grounds of race, color, handicap or national origin or exclusion from participation, denial of benefits or other discrimination under any program or activity provided by any party;

H.  Section 202 of Executive Order 11246, as amended by Executive Order 11375, relating to equal employment opportunities, the implementing rules and regulation of the Secretary of Labor, and all contract clauses and requirements which are applicable and set forth therein are incorporated herein by specific reference;

I.  Sections 503 and 504 of the Rehabilitation Act of 1973 and Title IV of the Vietnam Era Veterans Readjustment Assistance Act of 1974 relating to employment and advancement in employment of qualified handicapped individuals, disabled veterans of the Vietnam era, the implementing rules and regulations of the Secretary of Labor, and all contract clauses and requirements which are applicable and set forth therein are incorporated herein by specific reference;

J.  Sections 1 and 3 of Executive Order 11625 relating to the promotion of minority business enterprises, the implementing rules and regulations of the General Services Administration, and all contract clauses and requirements which are applicable and set forth therein are incorporated herein by specific reference

15.   **Warranty**

    A.    Limited Warranty; Exclusion of Other Warranties. THIS LIMITED WARRANTY IS THE SOLE WARRANTY PROVIDED BY PROVIDER WITH RESPECT TO THE PRODUCTS. NO SALES BROCHURE OR OTHER PROMOTIONAL LITERATURE SHALL CONSTITUTE A GUARANTY OR WARRANTY BY PROVIDER. PROVIDER WARRANTS THAT THE PRODUCTS WILL OPERATE SUBSTANTIALLY IN CONFORMANCE WITH THE MANUFACTURER PUBLISHED SPECIFICATIONS WHEN SUBJECT TO NORMAL, PROPER AND INTENDED USAGE BY PROPERLY TRAINED PERSONNEL. MANUFACTURER PUBLISHED SPECIFICATIONS ARE AVAILABLE UPON REQUEST. IF ANY OF THE PRODUCTS ARE FOUND TO BE DEFECTIVE, SUCH PRODUCTS WILL, AT PROVIDER'S OPTION, BE REPAIRED AT PROVIDER'S COST OR BE REPLACED. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED AND PROVIDER DISCLAIMS ANY WARRANTY OF ANY OTHER KIND, INCLUDING ANY WARRANTY THAT THE PRODUCTS ARE MERCHANTABLE OR FIT FOR A PARTICULAR PURPOSE. PROVIDER DOES NOT WARRANT THAT THE PRODUCTS ARE ERROR-FREE OR WILL ACCOMPLISH ANY PARTICULAR RESULT.

    B.    Limitation of Liability. Provider's liability (whether under the theories of breach of contract or warranty, negligence or strict liability or otherwise) under this Agreement shall be limited as set forth above. IN NO EVENT SHALL PROVIDER'S LIABILITY EXCEED THE RENTAL OR PURCHASE PRICE OF THE PRODUCTS.

    C.    Disclaimer of Consequential Damages. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, BREACH OF ANY OBLIGATION OR WARRANTY IMPOSED ON PROVIDER HEREUNDER. Consequential damages shall include, without limitation, loss of use, income or profit, or loss sustained as the result of injury to any person, or loss or damage to any property, or loss or damage sustained as the result of work stoppage.

16.   **Miscellaneous Provisions**

    A.    Notices. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly delivered either i) when delivered (by hand or by overnight nationally recognized mail service) to the other party or ii) three (3) business days after the same have been deposited in a United States post office, with first class postage prepaid and addressed to the parties as follows or at such address as the party may have previously provided in writing:

    To Provider:    Dynamic Medical Systems, LLC
        2811 E Ana Street
        Rancho Dominguez, CA 90221
        Attn:   Contract Administrator
        Phone:  800-225-9080
        Fax:   866-896-7317

    To Facility:    Queen Ann's Lace Holdings, LLC
        dba Whitney Oaks Care Center
        3529 Walnut Ave
        Carmichael, CA 95608-3049
        Attn: Kyle Dahl – Administrator
        Phone: 916 488-8601
        Fax: 916 488-0695

B.    <u>Force Majeure</u>.  If either party fails to perform its obligations hereunder (except for the obligation to pay money) because of strikes, accidents, acts of God, weather conditions, or action or inaction of any governmental or other proper authority or other causes beyond its control, then, such failure to perform will not be deemed a default hereunder and will be excused without penalty until such time as said party is capable of performing.

C.    <u>Severability</u>.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held illegal, unenforceable or invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid, illegal or unenforceable shall not be affected thereby.

D.    <u>Successors and Assigns</u>.  Each and all of the provisions hereof shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

E.    <u>Integration</u>. This Agreement constitutes the entire understanding between the parties with respect to the subject matter described herein, and supersedes all prior negotiations, discussions, agreements or understandings, whether written, implied or oral.

F.    <u>Modification of Agreement</u>.  Any amendment or modification of or supplement to this Agreement must be in writing, expressly identifying this Agreement and the portion or portions thereof which are subject to modification, and signed by the parties.  This Agreement may not be modified, altered or added to by conduct, oral agreement, estoppels, and waiver or otherwise.

G.    <u>Fair Market Value</u>.  The amounts to be paid to Provider hereunder have been determined by the parties through good faith and arms-length bargaining to be the fair market value of the services to be rendered hereunder. No amount paid or to be paid hereunder is intended to be, nor will it be construed as, an offer, inducement or payment, whether directly or indirectly, overtly or covertly, for the referral of patients by Provider to Facility, or by Facility to Provider, or for the recommending or arranging of the purchase, lease or order of any item or service. For purposes of this section, Provider and Facility will include each such person or entity and any affiliate thereof.

H.    <u>Business Review</u>.  If more than 5 facilities are listed on Exhibt A or, if as a result of this Agreement, monthly revenue from all payer sources exceeds $10,000, the parties will meet at least semi-annually to review the objectives and activities relating to this Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates appearing under their respective signatures.

Facility: Queen Ann's Lace Holdings, LLC
dba Whitney Oaks Care Center

Provider:

Dynamic Medical Systems, LLC

By: _____

Print Name: Kyle Dahl _____

_____

Print Title:_ Administrator
_____

Date: _____

By: _____
        Greg Apostolou, General Manager

Date: _____

Account Executive: Robert Husband
Account Representative:

# EXHIBIT A

**Facility Name/s and Address/es:**

Chain name:  Plum Healthcare

Queen Ann's Lace Holdings, LLC
dba Whitney Oaks Care Center
3529 Walnut Ave
Carmichael, CA 95608-3049
Attn: Kyle Dahl – Administrator
Phone: 916 488-8601
Fax: 916 488-0695

**EXHIBIT B**

| Product | Tier I Rental Rate (Months 1 - 6) | Tier II Rental Rate (Months 7 - 12) | Tier III Rental Rate (Over 12 Months) |
|---|---|---|---|
| **Tiered Daily Rental Rate** | | | |
| AirDyne and/or Traditional Alternating Pressure & Low Air Loss Mattress | $   6.00 per day | $   4.50 per day | $   2.50 per day |
| AirDyne and/or Traditional Alternating Pressure & Low Air Loss Mattress with DynaBolster or Traditional Bolster | $   6.50 per day | $   5.00 per day | $   3.00 per day |

| **Daily Rentals** | |
|---|---|
| Bariatric Low Air Loss Mattress | $  13.00 per day |
| Bariatric Low Air Loss Mattress with Bolster | $  14.50 per day |
| Rotation Therapy Mattress | $  15.00 per day |
| Bariatric Rotation Therapy Mattress | $  20.00 per day |
| Air Powered Lateral Transfer System | $  15.00 per day |
| Bariatric Air Powered Lateral Transfer System | $  21.00 per day |
| Bariatric Bed Frame (750lb capacity) | |
|     W/Pressure Reducing Foam Mattress | $  22.50 per day |
|     W/Pressure Relieving Air Mattress | $  32.50 per day |
|     Full Scales for Bariatric Bed Frame | $   3.00 per day |
| Bariatric Commode | $   4.00 per day |
| Bariatric Wheelchair (all sizes) | $   5.50 per day |
| Bariatric Walker | $   2.00 per day |
| Bariatric Lift | $  18.00 per day |
| Bariatric Trapeze (freestanding) | $   3.00 per day |
| Bariatric Trapeze (bed mounted > 750lb capacity frame) | $   3.00 per day |
| CPM | $  13.00 per day |
| CPM Kit (Sale Only) | $  25.00 sale |
| SCD Machine | $  13.00 per day |
| Hi-Low Bed Frame | $ 120.00 per month |

Note: Medi-Cal residents will be eligible to remain on the product if they have a minimum of $240.00 or more available via share of cost (under Johnson vs. Rank), or, any other alternate payment source.

a) The Tier II and Tier III rates are applicable to continuous patient specific rental charges for Alternating and/or Low Air Loss Mattresses with or without a bolster. These rates apply only to rentals billed to and paid by each Facility and does not apply to 3rd party billing.

b) Tier price changes are effective on the first day of the calendar month immediately following the completion of each tier period.

c) Measurement for the various tiers begins on the commencement date of a signed provider agreement.

EXHIBIT C



### PREFERRED PROVIDER AGREEMENT

LAC Verdugo Operations LLC dba Glendale Post Acute Center ("Facility") a California limited liability company, located at 250 N. Verdugo Road, Glendale CA 91206and Dynamic Medical Systems LLC, a Nevada limited liability company ("Provider") located at 2811 E. Ana Street, Rancho Dominguez, CA 90221 (each a "Party" and collectively the "Parties") enter into this preferred provider agreement (this "Agreement") dated October 1, 2016, for the consideration and upon the terms and conditions set forth herein.

### RECITALS

WHEREAS, Facility owns and/or operates one or more healthcare facilities at the locations designated on Exhibit A hereto;

WHEREAS, Provider is engaged in the business of providing the products, services and related supplies described on Exhibits B and C attached hereto (the "Resources");

WHEREAS, Provider and Facility wish to enter into this Agreement to provide the terms and conditions whereby Provider shall provide the Resources to Facility;

 WHEREAS, the purpose of this Agreement is for Provider to provide on a rental or purchase basis as required, the Resources to Facility at all the locations listed on Exhibit A, attached hereto and incorporated herein by reference; and

WHEREAS, Facility has a need and desires to contract with Provider as its Preferred Provider (as defined below) for the provision of the Resources to patients who require such services as prescribed by their attending physician.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties hereto hereby agree as follows:

1.    **Preferred Provider; Requirements Contract; Scope.**

    A.    For purposes of this Agreement, Preferred Provider shall be defined as utilization of the Resources listed in Exhibits B and C with an aggregate 90% utilization rate for all Facility locations.  If utilization rates fall below an aggregate of 90% Facility shall have a ninety (90) day cure period to bring utilization to a level of 90% or greater. Should FACILITY fail to cure, Provider shall have the right to amend pricing in Exhibit B to commercially reasonable rates.

    B.    Facility hereby agrees to fill its requirements for Resources from Provider, subject to any legal rights of patients of Facility to choose alternative providers; and, in consideration thereof, Provider hereby agrees to fill the requirements of Facility for the Resources in an efficient, timely and professional manner, in substantial compliance with all applicable government regulations and at the rates specified herein.  The initial prices for the Resources are set forth on Exhibits B and C.

C.    Facility hereby represents and warrants that Exhibit A contains all locations currently owned or operated by Facility. In the event Facility acquires or adds additional management locations following the execution of this Agreement, such locations shall automatically be added to Exhibit A.

2.    **Term.**

The term of this Agreement shall be for an initial term ("Initial Term") of three (3) years from and after the Commencement Date.  For the purpose of this Agreement, the Commencement Date shall be October 1, 2016. Thereafter the Agreement will automatically be renewed for one (1) year periods ("Renewal Term") unless written notice is given by either Party at least ninety (90) days prior to the then expiration date of the term of this Agreement of such Party's intention not to renew the term of this Agreement for an additional period. Provider may increase the prices for Resources as set forth in Exhibits B and C hereto by up to 3% on each calendar year during the Initial Term and any Renewal Term upon prior written notice to the Facility.

3.    **Payment Terms.**

A.    Provider and Facility shall jointly determine whether specific Resources provided under this Agreement are to be reimbursed by Facility directly or whether Provider shall seek reimbursement from California Medi-Cal program ("Medi-Cal"), Medicare, or other third party payors for such Resources.

B.    For Resources charged directly to Facility, Facility is to remit payment to Provider within 30 days of receipt of invoice from Provider, including those residents who are receiving services for which Facility will seek reimbursement under Medicare, Medi-Cal/Medicaid, an HMO, or other governmental or third party payors.  A 1.5% late fee (or such lesser maximum amount allowed by law) will be charged for any outstanding balance not paid by the 31st day of Facility's receipt of invoice from Provider, which fee shall accrue every thirty (30) days thereafter until payment is received by Provider.  Facility's obligations to Provider shall accrue regardless of whether Facility receives reimbursement from third party payors for the provision of such Resources.

C.    For Resources charged to payors other than Facility, Provider reserves the right to determine and adjust fees charged for the Resources.

D.    Provider may seek Medi-Cal reimbursement directly for Medi-Cal Share of Cost for non-covered services as provided for in this Agreement and the Medi-Cal laws, regulations and provider manuals. Facility's Medi-Cal/Medicaid NPI Number is:  1659737906.

(i)    Medi-Cal Share of Cost. A resident who is a Medi-Cal beneficiary may charge the costs of Resources to his or her Medi-Cal share of cost. Facility, with consultation from Provider, assumes full responsibility for ensuring that Resources provided to residents under Medi-Cal share of cost are medically necessary, ordered by a physician and incorporated into the resident's plan of care. Facility agrees to be billed on behalf of the Medi-Cal recipient for Resources which are the subject of Treatment Authorization Request ("TAR") denials by the Department of Health Services field office or which are not submitted for TAR approval. Facility also agrees that if Resources are ordered for a qualifying resident, the share of cost can be billed directly in accordance with the judgment and consent decree in the Johnson v. Rank court action and Medi-Cal policy without submission of a TAR. Facility will obtain the resident's authorization to use share of cost for the ordered product (Medi-Cal Form DHS6114). The Parties agree that all pharmacy invoices, if any, will be deducted from a resident's share of cost prior to deducting any Resources. At no time will the Resources invoiced exceed a resident's share of cost less all pharmacy charges.

(ii) All Medi-Cal/Medicaid residents who meet the general regulations used in adjudicating Treatment or Prior Authorization Requests will be serviced by Provider and billed accordingly. Facility must provide the required documentation for each resident. Services for all Medi-Cal/Medicaid residents that do not meet the Medi-Cal/Medicaid general regulations will be billed to Facility.

4. **Breach or Default by Facility.**

If Facility does not pay the charges due hereunder or other amount required herein to be paid, fails to fulfill its responsibilities under Section 12 of this Agreement or otherwise breaches any of the terms or conditions of this Agreement, ceases doing business as a going concern, has a petition filed by or against it under any of the provisions of applicable bankruptcy laws then in effect, makes an assignment for the benefit of creditors, calls a general meeting of creditors or attempts any informal arrangement with creditors, or if a receiver or any officer of a court is appointed to have control of any Facility property, Provider shall have the right to exercise any one or more of the following remedies in order to protect its interests:

A. Terminate this Agreement in whole or in part;

B. Declare all unpaid charges to be immediately due and payable;

C. Take possession of any or all Resources (30 days after notice is given), wherever the same be located, without demand, without any court order or other process of law and without liability to Facility for any damages occasioned by such taking of possession; or

D. Pursue any other remedies existing at law or in equity.

5. **Breach of Default by Provider.**

This Agreement can be terminated by Facility by at least thirty (30) days prior written notice in the event of (i) a breach of default by Provider of its duties hereunder, which breach or default has not been cured within one hundred eighty (180) days of written notice delivered by Facility to Provider specifying, in sufficient detail for corrective action, the claimed default by Provider, (ii) any violation of applicable laws or regulations, termination of any license, permit or other registration, or violation of the eligibility requirements for reimbursement under any government program by Provider, which violation or termination has a material impact on Provider's ability to perform its duties hereunder or (iii) the occurrence or existence of any condition, practice, procedure, action, inaction or omission of, by or involving Provider which, in the reasonable opinion of Facility, constitutes either a threat to the health, safety and welfare of any patient, resident and/or employee or a violation of any law or regulation governing Facility's operation.

6. **Facility Indemnification.**

Provider agrees to indemnify and hold Facility harmless against any and all third party claims, liabilities, damages and expenses, including without limitation, reasonable attorney's fees incurred by the Party seeking indemnification in defending, or compromising actions brought against the Party seeking indemnification or its officers, directors, employees agents and contractors arising out of or related to the grossly negligent or willful acts or omissions of Provider or its employees, agents, and contractors in connection with the provision of services under this Agreement. Facility shall cooperate in the defense of any such claim, suit, action, or proceeding.

7. **Provider Indemnification.**

Facility agrees to indemnify and hold Provider and its officers, directors, employees, agents and contractors harmless against any and all third party claims, liabilities, damages and expenses, including without limitation, reasonable attorney's fees incurred by the Party seeking indemnification in

defending, or compromising actions brought against the Party seeking indemnification or its officers, directors, employees agents and contractors arising out of or related to the grossly negligent or willful acts or omissions of Facility or its employees, agents, and contractors in connection with the provision of services under this Agreement. Provider shall cooperate in the defense of any such claim, suit, action, or proceeding.

8. **Liability Coverage.**

Provider and Facility shall each maintain comprehensive general liability insurance at minimum levels of $1,000,000 per occurrence and $3,000,000 aggregate. Provider and Facility shall each provide the other Party with written evidence of such insurance coverage upon request.

9. **Governing Law, Jurisdiction, Venue. Attorney's Fees and Costs.**

This Agreement shall be governed by and construed under the laws of the State of California. In the event of any dispute relating to this Agreement, the parties hereto, regardless of their residence, shall be subject to the jurisdiction of the courts of the State of California. The parties further agree that this Agreement is made and entered into in Los Angeles County, California, and regardless of where this contract is to be performed, the parties agree that the state and federal courts located in Los Angeles County, California, have venue for the purposes of litigating any dispute, controversy or proceeding arising out of or related to this Agreement. If any action or arbitration proceeding is brought to interpret or enforce the terms of this Agreement, the prevailing Party will be entitled to recover its attorney's fees and costs, including, but not limited to, forum, private judge and arbitrator fees.

10. **Status of Parties**.

Neither PROVIDER nor FACILITY is for any purpose an agent, partner or employee of the other. This Agreement does not constitute a joint venture between the parties. It is agreed that in performing its services pursuant to this Agreement, PROVIDER and its employees will, at all times, be an independent contractor to FACILITY.

11. **Assignment.**

Provider shall be entitled to assign its rights under this Agreement to a sub-contractor, any affiliate of Provider, and to any company that acquires the business of Provider through acquisition or merger, without the consent of Facility. Facility may not assign its rights under this Agreement without the prior written consent of Provider. Notwithstanding the foregoing, the Parties hereto agree that this Agreement shall be binding on any Party that acquires the business of Facility in whole or in part through sale of equity, assets, merger, consolidation or other restructuring and/or assumes responsibility for or control over any of the facilities subject to this Agreement by management agreement or other contractual arrangement.

12. **Confidentiality Obligations; Records**

A. <u>Confidential Health Information</u>. Provider and Facility acknowledge that confidential patient records and other information that may constitute Protected Health Information (as defined under the Health Insurance Portability and Accountability Act ("HIPAA")) may be shared between the parties and their respective employees and agents pursuant to this Agreement. Provider and Facility shall each maintain the confidentiality of all patient information exchanged hereunder in accordance with all state and federal requirements, including, without limitation, the requirements of HIPAA and shall enter into a business associate agreement if necessary.

B.   <u>Other Confidentiality Obligations</u>.  Facility agrees that the forms, manuals, pricing and billing information and other non-public information and materials received by Facility from Provider are proprietary to Provider and will not be duplicated, used (except pursuant to the provisions of this Agreement) or disclosed to third parties without the prior written consent of Provider. Facility also agrees that the form and content of this Agreement will not be disclosed to third parties without the prior written consent of Provider.

C.   <u>Access to Records</u>.  During the term of this Agreement, and for a period of 4 years thereafter (or any longer period stipulated by applicable law), each Party shall upon reasonable request be provided copies of the other Party's patient records and other records relating to the services provided under this Agreement for purposes of treating patients, receiving payment for services provided (whether from Facility or other third party or governmental payors), health care operations or other lawful purposes in connection with this Agreement or as necessary to comply with audits or other investigations, but only to the extent such access may be given in compliance with all applicable laws and regulations governing the use and confidentiality of such records.  Each Party reserves the right to require payment from the other Party of its reasonable costs to provide any physical or electronic copies of such records.

13.   **Facility Responsibility.**  Facility shall:

A.   Fulfill its obligations under this Agreement in a timely, efficient and professional manner and in compliance with all applicable laws and regulations.

B.   Obtain all necessary treatment authorization requests ("TAR") or other prior authorizations required by governmental and other third party payors in order for either Facility or Provider to seek reimbursement for the Resources.

C.   Notify Provider promptly as to any changes in a resident's status, including but not limited to changes in billing status or discharge, for any resident receiving service under this Agreement within forty-eight (48) hours of such change. Facility agrees to supply Provider within five (5) days of request (written or oral), all available resident information requested by Provider and also provide a completed Utilization/Billing matrix at the end of each month.

D.   Maintain all Resources supplied by Provider clean and free from misuse or abuse and disinfect all rental Resources prior to being switched to a new resident.

E.   Compensate Provider for the repair or replacement cost of any lost or damaged equipment at Provider's sole discretion.

F.   Use and operate the equipment in accordance with all instructions and user manuals and take all reasonable and appropriate measures to minimize any risks assocaited with the use of the Resources.

G.   Provide properly trained and licensed caregivers to monitor the safe use of the Resources.

H.   Ensure that the Resources are properly prescribed or designated for use  to the specific patient's needs.

I.   Provide Provider with access to all resident charts and medical records on residents covered under Third Party billing program and accumulate resident usage on all Resources provided.

J.   Sign Provider's authorization request/delivery ticket and any other paperwork reasonably requested by Provider upon Facility's acceptance of any Resources.

K.    Determine the PAR levels, clean, store and set up PAR equipment and track PAR mattress utilization for Resources provided in connection with the PAR Program outlined in Section 13(B) below.

14.    **Provider Responsibility.  Provider shall:**

A.    Provide equipment on a prompt and timely basis, in accordance with accepted professional practices and in compliance with all state and federal laws.  Rental or sales charges shall begin to accrue on the day the Resources are placed at Facility and with respect to each order shall continue until Provider is notified either verbally or in writing to remove the Resources. Provider's normal hours of operation are 7:00 a.m. to 8:00 p.m., Monday through Friday. Twenty-four hour EMERGENCY ONLY service is available by dialing 800-225-9080 after hours, Saturday, Sunday and holidays.  Emergency requests will be handled by Provider's on-duty personnel.

B.    Assist Facility to implement a mattress rapid response rental program (the "PAR Program") whereby Provider shall deliver an agreed upon number of mattresses to Facility, and Facility shall be responsible for transferring mattresses between Facility's residents as necessary and appropriate.  Facility shall pay the rental rates for all mattresses within the PAR Program regardless of whether such mattresses are being used by a resident at all times.   Provider will reference prior historical utilization data to assist Facility in determining appropriate PAR level, will monitor all PAR level placements and periodically discuss necessary changes to the PAR level with Facility.  Provider will also assist Facility with conversion to third party billing when needed.

C.    Provide a Utilization/Billing Matrix to Facility.  The Matrix will be provided 7-10 days prior to each month-end.  This will allow Facility to notify Provider of any changes during the month so that Provider can make the necessary changes to ensure that Facility's invoices will reflect the correct billing status and dates of service.

D.    E-mail or fax a billing invoice to Facility approximately the third (3rd) business day of the month.

E.    Provide confirmation numbers when Facility requests an equipment delivery, pick-up or service.

F.    Upon request of Facility, provide copies of Provider's Policy and Procedure Manuals and/or Quality Assurance monitoring tools. Updates to the Policies and Procedures will be provided as changes occur.

G.    Provider shall not be obligated to provide any clinical consulting services in connection with the Resources unless the parties executed a separate agreement or addendum relating to such services.

15.    **Responsibilities of Both Parties:**

A.    Both parties represent and warrant that:

B.    Neither Party has been convicted of any offense related to healthcare or the provision of services paid for by Medicare, Medicaid, or any other federal or state healthcare program, or excluded from participation in Medicare or Medicaid or any other federal or state healthcare program;

C.    Neither Party is a party to any agreement or arrangement that would be violated or breached by the execution or delivery of this Agreement or the performance of any of the obligations under this Agreement, or that requires the consent of any third party (government or other) to enter into or perform any of the obligations under this Agreement;

D.   They are, and throughout the term of this Agreement shall remain, qualified to participate in Medicare, Medicaid and such other federal or state healthcare programs as may be required by them from time to time;

E.   They shall abide by the policies, procedures, and rules as established by either party hereto; and

F.   The Parties agree to comply with applicable state, local and federal laws, rules and regulations, including without limitation those under Health Insurance Portability and Accountability Act or Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C 117, the Federal False Claims Act, any policy and procedure statements that may be issued by those bodies, and the following:

G.   Title VI of the Civil Rights act of 1964 (PL 88-352) and all requirements imposed by applicable regulations of the US Department of Health and Human Services regarding discrimination on the grounds of race, color, handicap or national origin or exclusion from participation, denial of benefits or other discrimination under any program or activity provided by any Party;

H.   Section 202 of Executive Order 11246, as amended by Executive Order 11375, relating to equal employment opportunities, the implementing rules and regulation of the Secretary of Labor, and all contract clauses and requirements which are applicable and set forth therein are incorporated herein by specific reference;

I.   Sections 503 and 504 of the Rehabilitation Act of 1973 and Title IV of the Vietnam Era Veterans Readjustment Assistance Act of 1974 relating to employment and advancement in employment of qualified handicapped individuals, disabled veterans of the Vietnam era, the implementing rules and regulations of the Secretary of Labor, and all contract clauses and requirements which are applicable and set forth therein are incorporated herein by specific reference;

J.   Sections 1 and 3 of Executive Order 11625 relating to the promotion of minority business enterprises, the implementing rules and regulations of the General Services Administration, and all contract clauses and requirements which are applicable and set forth therein are incorporated herein by specific reference

16.   **Warranty**

A.   Limited Warranty; Exclusion of Other Warranties. THIS LIMITED WARRANTY IS THE SOLE WARRANTY PROVIDED BY PROVIDER WITH RESPECT TO THE PRODUCTS.  NO SALES BROCHURE OR OTHER PROMOTIONAL LITERATURE SHALL CONSTITUTE A GUARANTY OR WARRANTY BY PROVIDER.  PROVIDER WARRANTS THAT THE PRODUCTS WILL OPERATE SUBSTANTIALLY IN CONFORMANCE WITH THE MANUFACTURER PUBLISHED SPECIFICATIONS WHEN SUBJECT TO NORMAL, PROPER AND INTENDED USAGE BY PROPERLY TRAINED PERSONNEL. MANUFACTURER PUBLISHED SPECIFICATIONS ARE AVAILABLE UPON REQUEST. IF ANY OF THE PRODUCTS ARE FOUND TO BE DEFECTIVE, SUCH PRODUCTS WILL, AT PROVIDER'S OPTION, BE REPAIRED AT PROVIDER'S COST OR BE REPLACED. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED AND PROVIDER DISCLAIMS ANY WARRANTY OF ANY OTHER KIND, INCLUDING ANY WARRANTY THAT THE PRODUCTS ARE MERCHANTABLE OR FIT FOR A PARTICULAR PURPOSE.  PROVIDER DOES NOT WARRANT THAT THE PRODUCTS ARE ERROR-FREE OR WILL ACCOMPLISH ANY PARTICULAR RESULT.

B.   Limitation of Liability. Provider's liability (whether under the theories of breach of contract or warranty, negligence or strict liability or otherwise) under this Agreement shall be limited as set

forth above. IN NO EVENT SHALL PROVIDER'S LIABILITY EXCEED THE RENTAL OR PURCHASE PRICE OF THE PRODUCTS.

C.    Disclaimer of Consequential Damages. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, BREACH OF ANY OBLIGATION OR WARRANTY IMPOSED ON PROVIDER HEREUNDER. Consequential damages shall include, without limitation, loss of use, income or profit, or loss sustained as the result of injury to any person, or loss or damage to any property, or loss or damage sustained as the result of work stoppage.

## 17.    Miscellaneous Provisions

A.    Ownership.    Title to all rental Resources provided under this Agreement at all times shall remain with PROVIDER, unless otherwise sold to Facility.

B.    Notices. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly delivered either i) when delivered (by hand or by overnight nationally recognized mail service) to the other Party or ii) three (3) business days after the same have been deposited in a United States post office, with first class postage prepaid and addressed to the parties as follows or at such address as the Party may have previously provided in writing:

To Provider:        Dynamic Medical Systems, LLC
                    2811 E Ana Street
                    Rancho Dominguez, CA 90221
                    Attn:    Contract Administrator
                    Phone:  800-225-9080
                    Fax:    866-896-7317

To Facility:        LAC Verdugo Operations LLC Dba
                    Glendale Post Acute Center
                    250 N. Verdugo Road
                    Glendale CA 91206
                    Attn: Catherine Rodriguez – Administrator
                    Phone: 818 244-1133
                    Fax: 818 244-7961

B.    Force Majeure. If either Party fails to perform its obligations hereunder (except for the obligation to pay money) because of strikes, accidents, acts of God, weather conditions, or action or inaction of any governmental or other proper authority or other causes beyond its control, then, such failure to perform will not be deemed a default hereunder and will be excused without penalty until such time as said Party is capable of performing.

C.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Each Party agrees that a photocopy or facsimile of this document with the signature of authorized representatives may be accepted with the same authority as the original.

D.    Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held illegal, unenforceable or invalid, the remainder of this

Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid, illegal or unenforceable shall not be affected thereby.

E.   <u>Waiver</u>.   Waiver by either Party of a breach or violation of any provision of this Agreement will not operate as, or be construed to be, a waiver of any prior, concurrent, or subsequent breach or any other provision of this Agreement.   None of the provisions of this Agreement will be considered waived by either Party except when such waiver is given in writing.

D.   <u>Successors and Assigns</u>.   Each and all of the provisions hereof shall be binding on and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

E.   <u>Integration</u>.   This Agreement constitutes the entire understanding between the parties with respect to the subject matter described herein, and supersedes all prior negotiations, discussions, agreements or understandings, whether written, implied or oral.

F.   <u>Modification of Agreement</u>.   Any amendment or modification of or supplement to this Agreement must be in writing, expressly identifying this Agreement and the portion or portions thereof which are subject to modification, and signed by the parties.   This Agreement may not be modified, altered or added to by conduct, oral agreement, estoppels, and waiver or otherwise.

G.   <u>Fair Market Value</u>.   The amounts to be paid to Provider hereunder have been determined by the parties through good faith and arms-length bargaining to be the fair market value of the services to be rendered hereunder. No amount paid or to be paid hereunder is intended to be, nor will it be construed as, an offer, inducement or payment, whether directly or indirectly, overtly or covertly, for the referral of patients by Provider to Facility, or by Facility to Provider, or for the recommending or arranging of the purchase, lease or order of any item or service. For purposes of this section, Provider and Facility will include each such person or entity and any affiliate thereof.

H.   <u>Business Review</u>.   If more than 5 facilities are listed on Exhibt A or, if as a result of this Agreement, monthly revenue from all payer sources exceeds $10,000, the parties will meet at least semi-annually to review the objectives and activities relating to this Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates appearing under their respective signatures.

Facility: LAC Verdugo Operations LLC
Dba Glendale Post Acute Center

By: _____

Print Name:  Catherine Rodriguez

Print Title: Administrator_____

Date: _____ 10/10/16 _____

Provider:

Dynamic Medical Systems, LLC

Greg Apostolou
Digitally signed by Greg Apostolou
DN: cn=Greg Apostolou,
o=Dynamic Medical Systems, LLC,
ou, email=grega@godynamic.com,
c=US
Date: 2016.10.11 14:24:53 -07'00'

By _____
Greg Apostolou, General Manager

Date: _____ 10/11/16 _____

Account Executive: Shannon Griggs
Account Representative: Marco Carreon

**EXHIBIT A**

**Facility Name/s and Address/es**:


LAC Verdugo Operations LLC Dba Glendale
Post Acute Center 250 N. Verdugo Road
Glendale CA 91206
Attn: Catherine Rodriguez – Administrator
Phone: 818 244-1133
Fax: 818 244-7961

**EXHIBIT B**

| Product | Rental Rate |
| --- | --- |
| **Daily Rentals** | |
| Alternating Pressure Mattress – Foam | $   6.00 per day |
| Alternating Pressure Mattress with Bolster- Foam | $   6.50 per day |
| Alternating Pressure Mattress | $   6.00 per day |
| Alternating Pressure Mattress with Bolster | $   6.50 per day |
| Alternating Pressure and Low Air Loss Mattress | $   8.00 per day |
| Alternating Pressure and Low Air Loss Mattress with Bolster | $   8.50 per day |
| Dolphin Mattress | $ 40.00 per day |
| Dolphin Mattress with Bolster | $ 41.00 per day |
| Bariatric AirDyne or Traditional LAL/AP Mattress (powered) | $ 14.00 per day |
| Bariatric AirDyne or Traditional LAL/AP Mattress (powered) with Bolster | $ 14.50 per day |
| Rotation Therapy Mattress | $ 20.00 per day |
| Bariatric Rotation Therapy Mattress | $ 25.00 per day |
| Air Powered Lateral Transfer System | $ 20.00 per day |
| Bariatric Air Powered Lateral Transfer System | $ 25.00 per day |
| Bariatric Bed Frame W / Pressure Reducing Foam Mattress | $ 25.00 per day |
| Bariatric Bed Frame W / Pressure Relieving Air Mattress | $ 40.00 per day |
| Scale for Bariatric Frame | $   5.00 per day |
| Attached Trapeze for Bariatric Frame | $   5.00 per day |
| Bariatric Trapeze (freestanding) | $   5.00 per day |
| Bariatric Commode | $   5.00 per day |
| Wheelchair | $   7.00 per day |
| Bariatric Wheelchair (30" width or greater) | $ 10.00 per day |
| Bariatric Walker | $   3.50 per day |
| Bariatric Lift | $ 18.00 per day |
| Quantum NPWT Pump | $ 40.00 per day |

CPM                                                    $   12.00 per day

CPM Kit (Sale Only)                                    $   25.00 sale

SCD Machine                                            $   9.00 per day

Hi-Low Bed Frame                                       $   7.00 per day

Hi-Low Bed Extension                                   $   .50 per day

Note: Medi-Cal residents will be eligible to remain on the product if they have a minimum of $240.00 or more available via share of cost (under Johnson vs. Rank), or, any other alternate payment source.

**EXHIBIT C**

| NPWT Purchase Items | Price |
|---|---|
| ITI Dressing Set - Large (25 x 15 x 3 cm) | $ 36.43 |
| ITI Dressing Set - Medium (20 x 12.5 x 3 cm) | $ 33.57 |
| ITI Dressing Set - Small (10 x 8 x 3 cm) | $ 30.71 |
| ITI Dressing Set - Extra Large (58.5 x 33 x 3 cm)* | $ 121.43 |
| ITI Dressing Bridge Kit (two foam strips plus drape) | $ 60.00 |
| ITI White Foam Dressing only- Large | $ 31.43 |
| ITI Suction Tubing w/ Speed Connect only | $ 17.14 |
| ITI Y-Connector | $ 7.86 |
| ITI Canister Set w/ Gel (300cc) | $ 24.28 |
| ITI Canister Set w/o Gel (300cc)* | $ 24.28 |
| ITI Canister Set w/ Gel (500cc)*,** | $ 34.14 |
| Quantum I.V. Pole Hanger*,** | $ 65.00 |
| ITI Irrigation tubing w/ Speed Connect* | $ 26.29 |
| ITI Irrigation Delivery Set* | $ 32.00 |
| ITI Polyurethane Drape (25.5 x 33 cm)* | $ 9.86 |
| ITI SensiSkin Drape (25.5 x 33 cm) | $ 11.29 |
| ITI AC Power Supply | $ 85.71 |
| Quantum AC Power Supply | $ 85.71 |
| Quantum Carrying Case (black) | $ 35.71 |

* Indicates Quantum special order items. These are non-refundable/non-returnable and may only be available in case quantities. Expect an increased delivery time. Customer can pay for expedited shipping.
**I.V. Pole Hanger must be purchased to use when ordering 500cc canister sets